## HOSPITAL CORPORATION OF AMERICA, Petitioner,

v.

## FEDERAL TRADE COMMISSION, Respondent.

No. 85-3185.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 12, 1986.

Decided Dec. 18, 1986.

---

William D. Iverson, Covington & Burling, Washington, D.C., for petitioner.

Melvin H. Orlans, F.T.C., Washington, D.C., for respondent.

Before POSNER and FLAUM, Circuit Judges, and CAMPBELL, Senior District Judge.*

POSNER, Circuit Judge.

Hospital Corporation of America, the largest proprietary hospital chain in the United States, asks us to set aside the decision by the Federal Trade Commission that it violated section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, by the acquisition in 1981 and 1982 of two corporations, Hospital Affiliates International, Inc. and Health Care Corporation. Before these acquisitions (which cost Hospital Corporation almost $700 million), Hospital Corporation had owned one hospital in Chattanooga, Tennessee. The acquisitions gave it ownership of two more. In addition, pursuant to the terms of the acquisitions it assumed contracts, both with four-year terms, that Hospital Affiliates International had made

* Hon. William J. Campbell of the Northern Dis-       trict of Illinois, sitting by designation.

to manage two other Chattanooga-area hospitals. So after the acquisitions Hospital Corporation owned or managed 5 of the 11 hospitals in the area. Later one of the management contracts was cancelled; and one of the lesser issues raised by Hospital Corporation, which we might as well dispose of right now, is whether the Commission should have disregarded the assumption of that contract. We agree with the Commission that it was not required to take account of a post-acquisition transaction that may have been made to improve Hospital Corporation's litigating position. The contract was cancelled after the Commission began investigating Hospital Corporation's acquisition of Hospital Affiliates, and while the initiative in cancelling was taken by the managed hospital, Hospital Corporation reacted with unaccustomed mildness by allowing the hospital to withdraw from the contract. For it had sued three other hospitals that tried to get out of their management contracts with Hospital Affiliates when Hospital Corporation assumed the contracts—only none of these hospitals was in a market where Hospital Corporation's acquisition of Hospital Affiliates was likely to be challenged. Post-acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight. Cf. *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 276 (7th Cir.1981). The Commission was entitled to give it no weight in this case, both to simplify the adjudication of merger cases generally and because excluding this one hospital would not have altered the market share figures significantly.

If all the hospitals brought under common ownership or control by the two challenged acquisitions are treated as a single entity, the acquisitions raised Hospital Corporation's market share in the Chattanooga area from 14 percent to 26 percent. This made it the second largest provider of hospital services in a highly concentrated market where the four largest firms together had a 91 percent market share compared to 79 percent before the acquisitions. These are the FTC's figures, and Hospital Corporation thinks they are slightly too high

(quite apart from the question what to do with either or both management contracts); but the discrepancy is too slight to make a legal difference. Nor would expressing the market shares in terms of the Herfindahl index alter the impression of a highly concentrated market.

The administrative law judge concluded that the acquisitions violated section 7 because of their probable anticompetitive effects in the Chattanooga hospital market. While modifying some of his findings, the Commission agreed that the acquisitions were unlawful and ordered Hospital Corporation to divest the hospitals acquired in Chattanooga and to notify the Commission, in advance, of any similar acquisitions planned for anywhere in the country. The Clayton Act allows Hospital Corporation to seek judicial review of the Commission's order in any circuit in which it does business, see 15 U.S.C. § 21(c), and for unexplained reasons it has chosen this circuit. It makes three arguments to us: there is no reasonable probability that its acquisitions in Chattanooga will lessen competition substantially; anyway the Federal Trade Commission has no constitutional power to bring an enforcement action, because the members of the Commission do not serve at the pleasure of the President; failing all else, Hospital Corporation should at least not be required to give the Commission advance notice of all future acquisitions.

The first 79 pages of Hospital Corporation's 85–page opening brief are devoted to the first argument, yet they make no mention of the standard of judicial review of the Federal Trade Commission's findings of fact and no effort to show that the findings are vulnerable under it. The standard is the familiar substantial-evidence standard: findings of fact that are supported by substantial evidence on the record considered as a whole bind the reviewing court. See 15 U.S.C. §§ 21(c), 45(c); *FTC v. Indiana Federation of Dentists,* —— U.S. ——, 106 S.Ct. 2009, 2015–16, 90 L.Ed.2d 445 (1986); *FTC v. Algoma Lumber Co.,* 291 U.S. 67, 73, 54 S.Ct. 315,

318, 78 L.Ed. 655 (1934); *Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1329 (7th Cir.1981); *Fruehauf Corp. v. FTC*, 603 F.2d 345, 351 (2d Cir.1979); *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1149 (9th Cir.1984). When the FTC pointed out this omission Hospital Corporation replied: "The decisive question on this appeal is ... whether Chattanooga hospitals are likely to collude because of these acquisitions. This is a matter of economic analysis, not a dispute of underlying facts." The first sentence is wrong: the issue for this court is not whether the acquisitions create a danger of collusion but whether the Commission's conclusion that they do is supported by substantial evidence on the record as a whole. The second sentence is irrelevant, because the substantial evidence rule (like the clearly erroneous rule, see *Mucha v. King*, 792 F.2d 602, 604–06 (7th Cir.1986)) applies to ultimate as well as underlying facts, including economic judgments. This is implicit in the many cases that hold that the ultimate question under the Clayton Act—whether the challenged transaction may substantially lessen competition—is governed by the substantial evidence rule. See, e.g., *National Dairy Products Corp. v. FTC*, 412 F.2d 605, 616, 620 (7th Cir.1969); *Dean Milk Co. v. FTC*, 395 F.2d 696, 709, 711–13 (7th Cir.1968); *Yamaha Motor Co., Ltd. v. FTC*, 657 F.2d 971, 977 and n. 7 (8th Cir.1981); *Fruehauf Corp. v. FTC, supra,* 603 F.2d at 355; *RSR Corp. v. FTC*, 602 F.2d 1317, 1320, 1325 (9th Cir.1979); *Ash Grove Cement Co. v. FTC*, 577 F.2d 1368, 1377–79 (9th Cir.1978). (All but the first two of these decisions were section 7 cases, like this one.) Hospital Corporation has argued the case to us as if we were the FTC, which assuredly we are not. Our only function is to determine whether the Commission's analysis of the probable effects of these acquisitions on hospital competition in Chattanooga is so implausible, so feebly supported by the record, that it flunks even the deferential test of substantial evidence.

The Commission's detailed analysis of those effects fills most of a 117–page opinion that, whatever its substantive merits or demerits, is a model of lucidity. The Commission may have made its task harder (and opinion longer) than strictly necessary, however, by studiously avoiding reliance on any of the Supreme Court's section 7 decisions from the 1960s except *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), which took an explicitly economic approach to the interpretation of the statute. The other decisions in that decade—in particular *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *United States v. Aluminum Co. of America*, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); *United States v. Von's Grocery Co.*, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966), and *United States v. Pabst Brewing Co.*, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966)—seemed, taken as a group, to establish the illegality of any nontrivial acquisition of a competitor, whether or not the acquisition was likely either to bring about or shore up collusive or oligopoly pricing. The elimination of a significant rival was thought by itself to infringe the complex of social and economic values conceived by a majority of the Court to inform the statutory words "may ... substantially ... lessen competition."

None of these decisions has been overruled. Although both *United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974), and *United States v. Citizens & Southern Nat'l Bank*, 422 U.S. 86, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975) (both discussed in our recent decision in *Ball Memorial Hospital, Inc. v. Mutual Hospital Ins., Inc.*, 784 F.2d 1325, 1336–37 (7th Cir.1986)), refused to equate the possession of a significant market share with a significant threat to competition, these cases involved highly unusual facts, having no counterpart in this case, that required discounting large market shares. In *General Dynamics* the shares were of current sales (of coal) made pursuant to long-term contracts entered into a long time ago; future sales would depend on uncommitted reserves, and one

of the acquired firms had no uncommitted reserves. In *Citizens & Southern* the acquired banks were already under the effective control of the acquirer (they were its "de facto branches"), so that the formal merger had little competitive significance.

These cases show that market share figures are not always decisive in a section 7 case, but it can be argued that the cases themselves carve only limited exceptions to the broad holdings of some of the merger decisions of the 1960s. *General Dynamics* was like a failing-company case; in *Citizens & Southern* the merger was a mere formality—like a marriage ceremony between common law spouses. The most important developments that cast doubt on the continued vitality of such cases as *Brown Shoe* and *Von's* are found in other cases, where the Supreme Court, echoed by the lower courts, has said repeatedly that the economic concept of competition, rather than any desire to preserve rivals as such, is the lodestar that shall guide the contemporary application of the antitrust laws, not excluding the Clayton Act. For recent discussions of this point, citing the relevant precedents, see *Fishman v. Estate of Wirtz*, 807 F.2d 520, 535–536 (7th Cir.1986); *id.* at 565–567 (separate opinion); *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1437 (7th Cir.1986). See also *Cargill, Inc. v. Montfort of Colorado, Inc.*, —— U.S. ——, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). Applied to cases brought under section 7, this principle requires the district court (in this case, the Commission) to make a judgment whether the challenged acquisition is likely to hurt consumers, as by making it easier for the firms in the market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level. So it was prudent for the Commission, rather than resting on the very strict merger decisions of the 1960s, to inquire into the probability of harm to consumers. In any event, even if we thought those decisions still authoritative, we could not uphold the Commission's decision on a rationale different from its own. See *FTC v. Indiana Federation of Dentists, supra,* 106 S.Ct. at

2016; *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 459–460, 87 L.Ed. 626 (1943); *Illinois v. ICC*, 722 F.2d 1341, 1348–49 (7th Cir.1983).

When an economic approach is taken in a section 7 case, the ultimate issue is whether the challenged acquisition is likely to facilitate collusion. In this perspective the acquisition of a competitor has no economic significance in itself; the worry is that it may enable the acquiring firm to cooperate (or cooperate better) with other leading competitors on reducing or limiting output, thereby pushing up the market price. Hospital Corporation calls the issue whether an acquisition is likely to have such an effect "economic," which of course it is. But for purposes of judicial review, as we have said, it is a factual issue subject to the substantial evidence rule, not a legal issue on which review usually is plenary and invariably is much less deferential than is the review of findings of fact. One of the main reasons for creating the Federal Trade Commission and giving it concurrent jurisdiction to enforce the Clayton Act was that Congress distrusted judicial determination of antitrust questions. It thought the assistance of an administrative body would be helpful in resolving such questions and indeed expected the FTC to take the leading role in enforcing the Clayton Act, which was passed at the same time as the statute creating the Commission. See Henderson, The Federal Trade Commission, ch. 1 (1924). In the present case the underlying facts are, as Hospital Corporation asserts, largely undisputed. The dispute is over the inferences of competitive consequence to be drawn from them. But the drawing of those inferences is a matter within the Commission's primary responsibility too. There is plenty of evidence to support the Commission's prediction of adverse competitive effect in this case; whether we might have come up with a different prediction on our own is irrelevant.

The acquisitions reduced the number of competing hospitals in the Chattanooga market from 11 to 7. True, this calculation assumes that the hospitals that came under the management although not ownership of Hospital Corporation should be considered allies rather than competitors of Hospital Corporation; but the Commission was entitled to so conclude. The manager (Hospital Corporation) sets the prices charged by the managed hospitals, just as it sets its own prices. Although the pricing and other decisions that it makes in its management role are subject to the ultimate control of the board of directors of the managed hospital, there is substantial evidence that the board usually defers to the manager's decisions. If it were not inclined to defer, it would not have a management contract; it would do its own managing, through officers hired by it. A hospital managed by Hospital Corporation is therefore unlikely to engage in vigorous or perhaps in any price competition with Hospital Corporation—or so at least the Commission was entitled to conclude.

The reduction in the number of competitors is significant in assessing the competitive vitality of the Chattanooga hospital market. The fewer competitors there are in a market, the easier it is for them to coordinate their pricing without committing detectable violations of section 1 of the Sherman Act, which forbids price fixing. This would not be very important if the four competitors eliminated by the acquisitions in this case had been insignificant, but they were not; they accounted in the aggregate for 12 percent of the sales of the market. As a result of the acquisitions the four largest firms came to control virtually the whole market, and the problem of coordination was therefore reduced to one of coordination among these four.

Moreover, both the ability of the remaining firms to expand their output should the big four reduce their own output in order to raise the market price (and, by expanding, to offset the leading firms' restriction of their own output), and the ability of outsiders to come in and build completely new hospitals, are reduced by Tennessee's certificate-of-need law. Any addition to hospital capacity must be approved by a state agency. The parties disagree over whether this law, as actually enforced, inhibits the expansion of hospital capacity. The law may indeed be laxly enforced. Not only is there little evidence that it has ever prevented a hospital in Chattanooga from making a capacity addition it wanted to make, but empirical studies of certificate of need regulation nationwide have found little effect on hospital expenditures. See Joskow, Controlling Hospital Costs: The Role of Government Regulation, ch. 7 (1981). Yet the Tennessee law might have some effect under the conditions that would obtain if the challenged acquisitions enabled collusive pricing of hospital services. Should the leading hospitals in Chattanooga collude, a natural consequence would be the creation of excess hospital capacity, for the higher prices resulting from collusion would drive some patients to shorten their hospital stays and others to postpone or reject elective surgery. If a noncolluding hospital wanted to expand its capacity so that it could serve patients driven off by the high prices charged by the colluding hospitals, the colluders would have not only a strong incentive to oppose the grant of a certificate of need but also substantial evidence with which to oppose it—the excess capacity (in the market considered as a whole) created by their own collusive efforts. At least the certificate of need law would enable them to delay any competitive sally by a noncolluding competitor. Or so the Commission could conclude (a refrain we shall now stop repeating). We add that at the very least a certificate of need law forces hospitals to give public notice, well in advance, of any plans to add capacity. The requirement of notice makes it harder for the member of a hospital cartel to "cheat" on the cartel by adding capacity in advance of other members; its attempt to cheat will be known in advance, and countermeasures taken.

All this would be of little moment if, in the event that hospital prices in Chattanooga rose above the competitive level, per-

sons desiring hospital services in Chattanooga would switch to hospitals in other cities, or to nonhospital providers of medical care. But this would mean that the Chattanooga hospital market, which is to say the set of hospital-services providers to which consumers in Chattanooga can feasibly turn, see *United States v. Philadelphia Nat'l Bank, supra,* 374 U.S. at 358–61, 83 S.Ct. at 1738–40; *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327–28, 81 S.Ct. 623, 627–29, 5 L.Ed.2d 580 (1961), includes hospitals in other cities plus nonhospital providers both in Chattanooga and elsewhere; and we do not understand Hospital Corporation to be challenging the Commission's market definition, which is limited to hospital providers in Chattanooga. Anyway, these competitive alternatives are not important enough to deprive the market shares statistics of competitive significance. Going to another city is out of the question in medical emergencies; and even when an operation or some other hospital service can be deferred, the patient's doctor will not (at least not for reasons of price) send the patient to another city, where the doctor is unlikely to have hospital privileges. Finally, although hospitals increasingly are providing services on an out-patient basis, thus competing with nonhospital providers of the same services (tests, minor surgical procedures, etc.), most hospital services cannot be provided by nonhospital providers; as to these, hospitals have no competition from other providers of medical care.

In showing that the challenged acquisitions gave four firms control over an entire market so that they would have little reason to fear a competitive reaction if they raised prices above the competitive level, the Commission went far to justify its prediction of probable anticompetitive effects. Maybe it need have gone no further. See *United States v. Philadelphia Nat'l Bank, supra,* 374 U.S. at 362–63, 83 S.Ct. at 1740–41; *Monfort of Colorado, Inc. v. Cargill, Inc.,* 761 F.2d 570, 580 (10th Cir.1985), rev'd on other grounds, —— U.S. ——, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). But it did. First it pointed out that the demand for hospital services by patients and their doctors is highly inelastic under competitive conditions. This is not only because people place a high value on their safety and comfort and because many of their treatment decisions are made for them by their doctor, who doesn't pay their hospital bills; it is also because most hospital bills are paid largely by insurance companies or the federal government rather than by the patient. The less elastic the demand for a good or service is, the greater are the profits that providers can make by raising price through collusion. A low elasticity of demand means that raising price will cause a relatively slight fall in demand, with the result that total revenues will rise sharply. For example, if the price elasticity of demand throughout the relevant portion of the demand curve is $-.2$, meaning that within that area every 1 percent increase in price will result in a two-tenths of 1 percent decrease in the quantity demanded, then a 10 percent increase in price will cause only a 2 percent reduction in quantity sold, and hence an almost 8 percent increase in total revenue. And since less is being produced, costs will fall at the same time that revenue is rising, resulting in an even greater percentage increase in profit than in revenue.

Second, there is a tradition, well documented in the Commission's opinion, of cooperation between competing hospitals in Chattanooga. Of course, not all forms of cooperation between competitors are bad. See, e.g., *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). But a market in which competitors are unusually disposed to cooperate is a market prone to collusion. The history of successful cooperation establishes a precondition to effective collusion—mutual trust and forbearance, without which an informal collusive arrangement is unlikely to overcome the temptation to steal a march on a fellow colluder by undercutting him slightly. That temptation is great. A seller who makes a profit of $10 on each sale at the cartel price, and then cuts price by $1 and

thereby (let us suppose) doubles his output, will increase his total profits by 180 percent.

The management contracts between Hospital Affiliates (itself an owner as well as manager of hospitals) and two other hospitals in Chattanooga—contracts that when taken over by Hospital Corporation gave it virtual control over the pricing and other decisions of two of its competitors, at least for a time—illustrate the unusual degree of cooperation in this industry; imagine Ford's signing a management contract with General Motors whereby General Motors installed one of its officers (who would remain an officer of GM) as Ford's manager. Hospitals routinely exchange intimate information on prices and costs in connection with making joint applications to insurers for higher reimbursement schedules. Such cooperation may be salutary but it facilitates collusion and therefore entitles the Commission to worry even more about large horizontal acquisitions in this industry than in industries where competitors deal with each other at arm's length.

Third, hospitals are under great pressure from the federal government and the insurance companies to cut costs. One way of resisting this pressure is by presenting a united front in negotiations with the third-party payors—which indeed, as we have just said, hospitals in Chattanooga have done. See also *United States v. North Dakota Hospital Ass'n,* 640 F.Supp. 1028 (D.N.D.1986). The fewer the independent competitors in a hospital market, the easier they will find it, by presenting an unbroken phalanx of representations and requests, to frustrate efforts to control hospital costs. This too is a form of collusion that the antitrust laws seek to discourage, though within the limitations of the *Noerr-Pennington* doctrine, which insulates some cooperative efforts to obtain government benefits from attack under antitrust law. See, e.g., *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *Grip-Pak, Inc. v. Illinois Tool Works, Inc.,* 694 F.2d 466, 471–73 (7th Cir.1982); Fischel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine,* 45 U.Chi.L.Rev. 80 (1977). Not all third-party payors, however, are governmental; not all cooperative efforts to influence government are immunized by the doctrine, see, e.g., *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); most important, the doctrine does not forbid enforcement efforts designed to make such efforts less effective by preserving a substantial number of competitors.

All these considerations, taken together, supported—we do not say they compelled—the Commission's conclusion that the challenged acquisitions are likely to foster collusive practices, harmful to consumers, in the Chattanooga hospital market. Section 7 does not require proof that a merger or other acquisition has caused higher prices in the affected market. All that is necessary is that the merger create an appreciable danger of such consequences in the future. A predictive judgment, necessarily probabilistic and judgmental rather than demonstrable (see *United States v. Philadelphia Nat'l Bank, supra,* 374 U.S. at 362, 83 S.Ct. at 1740), is called for. Considering the concentration of the market, the absence of competitive alternatives, the regulatory barrier to entry (the certificate of need law), the low elasticity of demand, the exceptionally severe cost pressures under which American hospitals labor today, the history of collusion in the industry, and the sharp reduction in the number of substantial competitors in this market brought about by the acquisition of four hospitals in a city with only eleven (one already owned by Hospital Corporation), we cannot say that the Commission's prediction is not supported by substantial evidence.

But of course we cannot just consider the evidence that supports the Commission's prediction. We must consider all the evidence in the record. We must therefore consider the significance of the facts,

pressed on us by Hospital Corporation, that hospital services are complex and heterogeneous, that the sellers in this market are themselves heterogeneous because of differences in the services provided by the different hospitals and differences in the corporate character of the hospitals (some are publicly owned, some are proprietary, and some are private but nonprofit), that the hospital industry is undergoing rapid technological and economic change, that the payors for most hospital services (Blue Cross and other insurance companies, and the federal government) are large and knowledgeable, and that the FTC's investigation which led to this proceeding was touched off by a complaint from a competitor of Hospital Corporation. Most of these facts do detract from a conclusion that collusion in this market is a serious danger, but it was for the Commission—it is not for us—to determine their weight.

The first fact is the least impressive. It is true that hospitals provide a variety of different services many of which are "customized" for the individual patient, but the degree to which this is true seems no greater than in other markets. Although collusion is more difficult the more heterogeneous the output of the colluding firms, there is no established threshold of complexity beyond which it is infeasible and Hospital Corporation made no serious effort to show that hospital services are more complex than products and services in other markets, such as steel, building materials, and transportation, where collusion has been frequent.

The heterogeneity of the sellers has two aspects: the hospitals in Chattanooga offer different mixtures of services; and they have different types of ownership—private for-profit ("proprietary"), private not-for-profit, public. The significance of these features is unclear. Concerning the first, if one assumes that collusion is practiced on a service-by-service basis, the fact that hospitals provide different mixtures of service seems irrelevant to the feasibility of collusion. True, since different types of service may not be substitutable—open-heart surgery is not a substitute for set-

ting a broken leg—specialized hospitals might not compete with one another. But that is not Hospital Corporation's argument. Its argument is that the different mixture of services in the different hospitals would make it difficult for their owners to fix prices of competing services, and this we don't understand.

Different ownership structures might reduce the likelihood of collusion but this possibility is conjectural and the Commission was not required to give it conclusive weight. The adoption of the nonprofit form does not change human nature, see Clark, *Does the Nonprofit Form Fit the Hospital Industry?*, 93 Harv.L.Rev. 1416, 1447, 1465 (1980), as the courts have recognized in rejecting an implicit antitrust exemption for nonprofit enterprises. *National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 100 n. 22, 104 S.Ct. 2948, 2960 n. 22, 82 L.Ed.2d 70 (1984). (There is a possible gap in the FTC's jurisdiction over acquisitions involving nonprofit corporations, compare 15 U.S.C. § 18 with 15 U.S.C. §§ 44, 45(a)(2), but it doesn't affect this case, since the acquired and acquiring firms are all proprietary.) Nonprofit status affects the method of financing the enterprise (substituting a combination of gift and debt financing for equity and debt financing) and the form in which profits (in the sense of the difference between revenue and costs) are distributed, and it may make management somewhat less beady-eyed in trying to control costs, see Clarkson, *Some Implications of Property Rights in Hospital Management*, 15 J.Law & Econ. 363 (1972). But no one has shown that it makes the enterprise unwilling to cooperate in reducing competition (some contrary evidence is presented in Hersch, *Competition and the Performance of Hospital Markets*, 1 Rev.Ind.Org. 324 (1984))—which most enterprises dislike and which nonprofit enterprises may dislike on ideological as well as selfish grounds. "Nonprofit hospitals, in fact, make rather sizable profits and these profits have been growing over time." Davis, *Economic Theories of Behavior in Nonprofit, Pri-*

*vate Hospitals*, 24 Econ. & Bus.Bull. at 1, 12 (Win.1972). See also Havighurst, *Regulation of Health Facilities and Services by "Certificate of Need"*, 59 Va.L.Rev. 1143, 1149 n. 23 (1973). True, nonprofit hospitals, private and public, harbor considerable antipathy toward proprietary hospitals, regarding them as "cream skimmers" who lure away the affluent patients that nonproprietary hospitals need to defray the costs of serving the less affluent. This antipathy may retard the emergence of the mutual trust and forbearance that informal collusive schemes depend on for their effectiveness. But the other side of this coin is that the nonproprietaries fear the competition of the proprietaries (that is the source, or a source, of their antipathy to them)— and what better foundation for a collusive arrangement than fear of competition?

Political pressures might inhibit publicly owned hospitals from raising prices. But similar pressures might inhibit them from expanding capacity to take on additional patients attracted by lower prices. A seller's refusal to join a cartel is significant only insofar as the seller can expand output if and when the cartel, by raising prices, drives consumers to search for sellers who are not part of the cartel and are willing to undersell it. A public hospital that in order to expand its capacity must seek governmental appropriations is in a poor position to take advantage of the competitive opportunities created by the presence of a cartel in its market. Moreover, compelled as they are to treat charity cases while minimizing the cost to the taxpayers of supporting the hospital, public hospitals are under added pressure to charge high prices to their paying (or insured) patients, which may make collusion particularly attractive to these hospitals.

The economic and technological ferment in the hospital industry may make collusion more difficult, but also more urgent, since risk-averse managers may be strongly inclined to stabilize, if necessary through collusion, whatever features of an uncertain environment they are able to bring under their control. Regarding the weighing of

such imponderables as this, much must be left to the judgment of the Commission.

The concentration of the buying side of a market does inhibit collusion. The bigger a buyer is, the more easily and lucratively a member of the cartel can cheat on his fellows; for with a single transaction, he may be able to increase his sales and hence profits dramatically. But with all the members thus vying for the large orders of big buyers, the cartel will erode. See Stigler, *A Theory of Oligopoly*, in Stigler, The Organization of Industry 39, 43–44 (1968). Hospital Corporation argues that the effective buyers of most hospital services are large and knowledgeable institutions rather than the patients who are the nominal buyers. But the role of the third-party payor is not quite that of a large buyer. The explicit contract between the insurance companies and their patients, and the statutory and regulatory obligations of government to Medicare and Medicaid recipients, require reimbursing patients for hospital services. Of course the insurer is not required to, and no insurer does, reimburse the insured for whatever services are consumed, regardless of price. But as a practical matter Blue Cross could not tell its subscribers in Chattanooga that it will not reimburse them for *any* hospital services there because prices are too high. As a practical matter it could not, if the four major hospital owners in the city, controlling more than 90 percent of the city's hospital capacity, raised their prices, tell its subscribers that they must use the remaining hospitals—whose aggregate capacity would be completely inadequate and, for reasons discussed earlier, could not readily, or at least rapidly, be expanded—if they want to be reimbursed. The insurers are in a better position to detect violations of the Sherman Act than the patients are but if the challenged acquisitions enable the major hospital owners in Chattanooga to collude without violating the Sherman Act, that is, collude tacitly rather than expressly, there would be no violations to detect and report.

Hospital Corporation's most telling point is that the impetus for the Commission's

complaint came from a competitor—a large nonprofit hospital in Chattanooga. A rational competitor would not complain just because it thought that Hospital Corporation's acquisitions would facilitate collusion. Whether the competitor chose to join a cartel or stay out of it, it would be better off if the cartel were formed than if it were not formed. For the cartel would enable this seller to raise its price, whether or not to the cartel level. By staying out of the cartel and by pricing just below the cartel price, the competitor might, as we noted earlier, do even better than by joining the cartel.

The hospital that complained to the Commission must have thought that the acquisitions would lead to lower rather than higher prices—which would benefit consumers, and hence, under contemporary principles of antitrust law, would support the view that the acquisitions were lawful. But this is just one firm's opinion. It was not binding on the Commission, which having weighed all the relevant facts concluded that the acquisitions had made collusion in this market significantly more likely than before. Since, moreover, the complainant was a nonprofit hospital, in attributing the complaint to fear of lower prices Hospital Corporation is contradicting its argument that the non-profit sector of the hospital industry does not obey the laws of economic self-interest.

■ This completes our discussion of liability and we turn to the constitutional question. Hospital Corporation's argument that the FTC is unconstitutional because its members exercise executive powers (e.g., by filing the complaint in this case) yet can be removed by the President only for cause occupies three pages of its opening brief and one page of its reply brief. Although we are not aficionados of long briefs and wordy arguments, we cannot be forced to consider far-reaching constitutional contentions presented in so offhand a manner. See *Hershinow v. Bonamarte*, 735 F.2d 264, 266 (7th Cir.1984); *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir.1983). Hospital Corporation is asking us to adopt a principle that would make every independent federal administrative agency unconstitutional; for the logic of its argument is not limited to the Federal Trade Commission but extends to the Interstate Commerce Commission, the Federal Communications Commission, the Federal Reserve Board, and the other well known, long established federal agencies whose members the President selects but cannot remove (before their terms expire) without cause. Hospital Corporation thus is asking us to decree a fundamental change in the structure of American government. Four pages is not an adequate presentation of the case for this revolutionary result. Brevity may be the soul of wit, but seismic constitutional change is not a laughing matter.

Among other omissions from Hospital Corporation's argumentation on the issue is any discussion of its standing to raise the issue and whether the issue is ripe in this proceeding. Supposing that the Constitution requires that the President be empowered to remove members of an agency such as the Federal Trade Commission which issues complaints of violation of federal law, Hospital Corporation has made no effort to show that the President *wants* to remove any member of the FTC who voted for the complaint in this case, or that the complaint would not have been issued if the President had plenary removal power, or that the concept of "cause" is too restrictive to satisfy the constitutional provisions vesting executive power in the President, or that the allegedly unconstitutional limitation on the President's power to remove FTC commissioners can't be severed from the Commission's power to file complaints (cf. *Glidden v. Zdanok*, 370 U.S. 530, 583, 82 S.Ct. 1459, 1490, 8 L.Ed.2d 671 (1962)). We are not even told whether the commissioners who voted for the complaint were appointed by President Reagan; if they were, it becomes somewhat implausible to suppose that the complaint would not have been issued if the President had the power to remove them. Although the Justice Department, which enforces section 7 of the Clayton Act concurrently with the FTC,

reviewed the acquisitions that the FTC later challenged, and decided to take no action, Hospital Corporation does not deny the FTC's assertion in its brief that the Department's investigation had not focused on the effects of the acquisitions in Chattanooga. So there is no showing that the FTC is acting at cross purposes with the President in this matter. There just is no reason to think the complaint would not have been issued but for the allegedly unconstitutional feature of the FTC's structure.

Whatever the anomalies of that structure, Hospital Corporation has not laid a proper foundation for its assault on it. We have reminded the bar in recent cases that issues cannot be preserved in this court merely by being raised, see *Hershinow v. Bonamarte, supra,* and *National Metalcrafters v. McNeil,* 784 F.2d 817, 825 (7th Cir.1986), or by being developed inadequately, see *Bonds v. Coca-Cola Co.,* 806 F.2d 1324, 1328 (7th Cir.1986), and that incorporation by reference of briefs filed in other cases (Hospital Corporation invited us to send for briefs filed in a case in another circuit in which the FTC's constitutionality has been challenged) will not preserve an issue either, see *Hunter v. Allis-Chalmers Corp.,* 797 F.2d 1417, 1430 (7th Cir.1986). Of course, to mount a proper constitutional attack Hospital Corporation might have needed to file a brief even longer than 85 pages; but if it needed additional pages, it should have requested leave to file a longer brief. (Actually, it had asked for and been granted leave to file a 90–page brief.) Or it could have compressed its discussion of the issue of liability, which didn't really require 79 pages. In its opening brief it volunteered to file a supplemental brief, but this request came too late, and is denied. After asking and being granted a request to file an oversized brief, a party cannot come back later and say, "Oh, by the way, 85 pages wasn't enough, and could we file another brief, of unspecified length, to address an issue we have just discovered could not be covered in an 85–page or even 90–page brief, after all?" We

decline to consider the merits of Hospital Corporation's constitutional complaint.

The last point raised by Hospital Corporation relates to the remedy decreed by the Commission, in particular the provision for advance notification of future acquisitions. Hospital Corporation argues that there is no justification for such relief. But as the Commission has a broad discretion, akin to that of a court of equity, in deciding what relief is necessary to cure a violation of law and ensure against its repetition, see *Herzfeld v. FTC,* 140 F.2d 207 (2d Cir.1944) (L. Hand, J.), the issue for us is not whether the Commission was right but whether it was reasonable. "It has wide latitude for judgment and the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist." *Jacob Siegel Co. v. FTC,* 327 U.S. 608, 613, 66 S.Ct. 758, 760, 90 L.Ed. 888 (1946). Hospital Corporation has not shown that the Commission's order is unreasonable. There is no merit to the suggestion that the order is punitive. Burdensome, yes; more burdensome than the requirements of premerger notification that the law imposes on firms that have not been found to have made an unlawful acquisition, yes. But "respondents must remember that those caught violating the Act must expect some fencing in." *FTC v. National Lead Co.,* 352 U.S. 419, 431, 77 S.Ct. 502, 510, 1 L.Ed.2d 438 (1957).

The Commission's order is affirmed and enforced. 15 U.S.C. § 21(c).