50 F.3d 710
 63 USLW 2594, 1995-1 Trade Cases P 70,934
 DEDICATION AND EVERLASTING LOVE TO ANIMALS, a California
Non-Profit Corporation, aka D.E.L.T.A. Rescue,
Plaintiff-Appellant,
v.
The HUMANE SOCIETY OF the UNITED STATES, INC., Defendant-Appellee.
 No. 93-56247.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 10, 1995.
Decided March 20, 1995.
 
 William R. Hess, Los Angeles, CA, for plaintiff-appellant.
 Dale B. Goldfarb, and Jean M. Cabillot, Harrington, Foxx, Dubrow, & Canter, Los Angeles, CA, for defendant-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before: BEEZER, and NOONAN, Circuit Judges, and EZRA,* District Judge.
 NOONAN, Circuit Judge:
 
 
 1
 Dedication and Everlasting Love to Animals (DELTA) appeals the judgment of the district court in favor of the Humane Society of the United States (Humane Society). We affirm the judgment of the district court.
 
 PROCEEDINGS
 
 2
 On August 24, 1992, DELTA filed a complaint in federal district court against Humane Society alleging the following:
 
 
 3
 DELTA is a nonprofit California corporation which rescues animals abandoned in the wilderness areas of Southern California, provides shelter for them, and attempts to find adopted homes for them; its activities are supported by public donations, obtained by such means as direct mail appeals. DELTA currently operates three shelters in the County of Los Angeles caring for approximately 750 dogs and cats. Humane Society is a Washington, D.C.-based corporation whose purpose is to promote the humane treatment of animals; its activities are supported by public donations obtained by such means as direct mail appeals.
 
 
 4
 DELTA further alleged that it and Humane Society are in direct competition in a geographic market that is nationwide; that the activities of both affect interstate commerce as income is generated from across the nation and as the United States Postal Service is used to raise funds; and that, in addition, "national media are used to educate the public concerning the activity...."
 
 
 5
 Basing itself on these allegations, DELTA charged Humane Society with restraining competition in violation of Sec. 1 of the Sherman Act, 15 U.S.C. Sec. 1, and attempting to monopolize the relevant line of commerce in violation of the Sherman Act, 15 U.S.C. Sec. 2. In furtherance of these violations, Humane Society was alleged to have attempted to have the Attorney General of California take disciplinary action against DELTA and to have caused "providers of valuable services" to discriminate against DELTA. DELTA claimed damages in the form of lost donations in excess of $100 million, trebled to $300 million.
 
 
 6
 Humane Society moved for summary judgment on the ground that the antitrust laws did not apply to the parties; that the parties did not operate in the same market; and that Humane Society did not have monopoly power in the market. Humane Society submitted a declaration showing that in 1987 Humane Society received $5,521,353; in 1988 $5,426,249; and in 1989 $7,262,083, and that in each of these years its expenses exceeded the donations received. The Humane Society also submitted by declaration copies of Internal Revenue Service Form 990s for 1988-1991 it had obtained from the American Association for the Prevention of Cruelty to Animals and the Massachusetts Association for the Prevention of Cruelty to Animals. An IRS Form 990 is the equivalent of a tax return filed by a nonprofit organization. It reflects the organization's annual revenues and expenses.
 
 
 7
 DELTA submitted its own 990 and a declaration as to its animal rescue work and as to its publishing books and generating magazine articles promoting animal welfare. DELTA further declared that it had made two million mailings in 1989, 75% of which were made outside of California, adding that it had had "an outstanding response" on the three occasions on which it made mailings using lists containing the names of donors to Humane Society.
 
 
 8
 After argument, the district court found as an uncontroverted fact that the Humane Society "has far less than a majority share of the relevant market." The court cited the 990s filed by the plaintiff, the defendant and the American Society for the Prevention of Cruelty to Animals and the Massachusetts Society for the Prevention of Cruelty to Animals. The district court also found as a fact that "DELTA has neither alleged nor offered any evidence of antitrust injury in the relevant market." Consequently, the district court held that DELTA had failed to establish any violation of either Sec. 1 or 2 of the Sherman Act.
 
 
 9
 DELTA appeals.
 
 ANALYSIS
 
 10
 We may affirm the judgment of a district court on any basis established by the record. DELTA has failed to offer any reason for us to believe that the Sherman Act applies to the solicitation of donations by Humane Society. The surprising statement has been made: "Nothing in the language of the [Sherman] Act prevents its application to the nonprofit or charity sectors." Richard Bartlett, Note, "United Charities and the Sherman Act," 91 Yale L.J. 1593, 1596 (1982). To the contrary, the Sherman Act expressly requires a showing of restraint "of trade or commerce among the several States" or of monopolizing or attempting to monopolize "any part of the trade or commerce among the several States." 15 U.S.C. Secs. 1 and 2. If statutory language is to be given even a modicum of meaning the solicitation of contributions by a nonprofit organization is not trade or commerce, and the Sherman Act has no application to such activity.
 
 
 11
 An unbroken line of decisions by the United States Supreme Court has defined what is meant by the restrictive terms chosen by Congress to express the scope of the statute. In one of the great Commerce Clause cases, Chief Justice Marshall defined "commerce" as "the commercial intercourse between nations, and parts of nations, in all its branches." Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 189, 6 L.Ed. 23 (1824). Interpreting the Sherman Act, the Supreme Court has spoken of "commerce" in terms of "the purchase, sale and exchange of commodities". Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 241, 20 S.Ct. 96, 107, 44 L.Ed. 136 (1899). The Supreme Court has stated that the term commerce is a "practical" conception, "drawn from the course of business." Swift & Co. v. United States, 196 U.S. 375, 398, 25 S.Ct. 276, 280, 49 L.Ed. 518 (1905). In the landmark case that found the Sherman Act did not apply to a sitdown strike organized by a union, the Supreme Court noted that Congress had chosen the words "restraint of trade" because the term had a well understood meaning at common law and that the phrase "or commerce" was not added to indicate a separate subject of restraint but "to relate the prohibited restraint of trade to interstate commerce for constitutional purposes." Apex Hosiery Co. v. Leader, 310 U.S. 469, 495, 60 S.Ct. 982, 993, 84 L.Ed. 1311 (1940). The court went on to observe that what were restraints of trade "were well understood long before the enactment of the Sherman law." They were "contracts for the restriction or suppression of competition in the market, agreements to fix prices, divide marketing territories, apportion customers, restrict production, and the like practices, which tend to raise prices or otherwise take from buyers or consumers the advantages which accrue to them from free competition in the market." Id. at 497, 60 S.Ct. at 994. The restraints at which the Sherman Act is aimed, the Court said, "are only those which are comparable to restraints deemed illegal at common law." Id. at 498, 60 S.Ct. at 995. These restraints of trade in the sense of the common law are "restriction or suppression of commercial competition." Id. at 500, 60 S.Ct. at 996. Thus the sitdown strike, even though it had a predictable effect on labor costs and therefore on the prices charged by the employer, was held not to be a restraint forbidden by the Sherman Act. Id. at 501, 512, 60 S.Ct. at 996, 1002. Fidelity to the language of the statute and its interpretation by the Supreme Court forbids extension of the Sherman Act to charitable fundraising never envisaged as trade by the common law.
 
 
 12
 A nonprofit organization, it is true, may engage in commercial activity, and this activity will then be subject to the Sherman Act, Goldfarb v. Virginia State Bar, 421 U.S. 773, 787-88, 95 S.Ct. 2004, 2013-15, 44 L.Ed.2d 572 (1975), just as a labor organization if it engages in the restraint of commerce is not immune from the Sherman Act. See Apex Hosiery, 310 U.S. at 505, 60 S.Ct. at 998. There is no immunity conferred by the form of the organization. Phillip E. Areeda and Howard Hovenkamp, Antitrust Law (1989) Supp.1993 p 232.2 at 297. But it is a leap from the conclusion that charitable form confers no immunity to the conclusion that charitable activities are subject to the Sherman Act when they do not constitute trade in the sense of the common law. No doubt, "the absence of a profit motive for a corporation is no guarantee of eleemosynary intent or practice," since profits can appear "in the form of salaries and perquisites." Id. No doubt, "[A]ll the possible objectives of antitrust law--from efficient resource allocation, minimum production costs, and maximum innovation to equal access to the market and 'fair' distribution according to competitive standards--can implicate the activities of non-profit organizations." Id. While all of these observations may be accurate, none of them explains how a statute focussed on acts "in trade or commerce" applies to acts not in trade or commerce.
 
 
 13
 To reason from the evils against which the statute is aimed in order to determine the scope of the statute while ignoring the language itself of the statute is to elevate substance over necessary form. The language in which the statute is cast confines and channels its purpose. Without due attention to the statutory terms, the statute becomes an open charter, a hunting license to be used where any prosecutor, plaintiff and judge sees an evil encompassed by the statute's purpose. To the contrary, statutory interpretation must start with the words that define and cabin its laudable purposes. See Thomas C. Arthur, "Farewell to the Sea of Doubt: Jettisoning the Constitutional Sherman Act," 74 Cal.L.Rev. 263, 272 (1986).
 
 
 14
 Areeda and Hovenkamp refer to Hospital Corp. of America v. FTC, 807 F.2d 1381 (7th Cir.1986), cert. denied, 481 U.S. 1038, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987), in which Judge Posner engaged in extensive economic analysis of the competitive effect of a merger that had been held by the Federal Trade Commission (the FTC) to violate the Clayton Act, 15 U.S.C. Sec. 18. Areeda and Hovenkamp, Antitrust Law Supp.1993 p 232.2 at 298. The authors also refer to FTC v. University Health Inc., 938 F.2d 1206 (11th Cir.1991), in which the FTC sought to enjoin a merger between two nonprofit hospitals and the court granted the preliminary injunction. Id. The Clayton Act, in language somewhat different from the Sherman Act, forbids certain acquisitions by or of corporations "engaged in commerce" and also forbids certain acquisitions by corporations subject to the FTC. 15 U.S.C. Sec. 18. The Hospital Corp. case involved an acquisition by "the largest proprietary chain in the United States" and so is not a very strong example of jurisdiction over nonprofits. 807 F.2d at 1383. In University Health, the court relied on the language giving jurisdiction to the FTC. University Health, 938 F.2d at 1214-17. These cases do not decide our case.
 
 
 15
 In a celebrated case against a variety of prestigious Eastern universities, the government attacked the scholarships agreement among them as a violation of the antitrust laws; most of the defendants settled before trial. In a two-to-one decision the Third Circuit held that the award of scholarships was commercial activity because the universities' recruitment of the most talented students by means of the scholarships was "self-serving," and the enhanced reputation of the universities was the quid pro quo for their largesse. The court, nonetheless, remanded to the district court for evaluation of the challenged agreement under the rule of reason. A settlement was effected after the remand, and the case ended with Massachusetts Institute of Technology, the sole defendant at trial, admitting no wrongdoing. See United States v. Brown University, 5 F.3d 658 (3d Cir.1993); William Honan, "M.I.T. Wins Right to Share Financial Aid Data in Antitrust Accord," N.Y. Times Dec. 23, 1993 at A13; see also Theodore J. Stachtiaris, Note, "Antitrust In Need: Undergraduate Financial Aid and United States v. Brown University," 62 Ford.L.Rev. 1745 (1994) (criticizing the Third Circuit majority). The Sherman Act has also been held to have no application to the educational corporation that conducts the accrediting of colleges and schools, thereby seriously affecting their ability to recruit students and regulating whatever market might be thought to exist in the world of education on the Eastern seaboard. Marjorie Webster Junior College, Inc. v. Middle States Ass'n. of Colleges and Secondary Schools, Inc., 432 F.2d 650, 654 (D.C.Cir.), cert. denied, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970).
 
 
 16
 Areeda and Hovenkamp pose the case of "two philanthropists who 'divided the market' by agreeing that one would care for the homeless on the east side of town while the other did so on the west side." Areeda and Hovenkamp, Antitrust Law Supp.1993 p 232.2 at 296. They agree that it "would seem strange" to bring the antitrust laws to bear on these two philanthropists. The division of care between the two animal-loving societies involved in this case is no more a division of a market than the division envisaged by the two philanthropists. It seems strange to bring the antitrust law to bear upon them.
 
 
 17
 There is something distinctly odd about the district court's findings of relative shares of the market because there isn't any market. Not every aspect of life in the United States is to be reduced to such a single-minded vision of the ubiquity of commerce. If self-serving activity is necessarily commercial, the Sherman Act embraces everything from a church fair to the solicitation of voluntary blood donors. On this basis, every engagement or marriage would be a restraint of trade, subject to suit and defensible only by application of the rule of reason. Consensual conduct is not necessarily commercial conduct even though reciprocation is the normal accompaniment of consensual conduct. From its donations Humane Society derives reputation, prestige, money for its officers; it does not engage in trade or commerce; and so no Sherman Act claim against it was stated by DELTA.
 
 
 18
 AFFIRMED.
 
 
 
 *
 The Honorable David A. Ezra, United States District Judge for the District of Hawaii, sitting by designation