UNITED STATES of America, Plaintiff,

v.

**MERCY HEALTH SERVICES**
and Finley Tri–States Health
Group, Inc., Defendants.

No. C94–1023.

United States District Court,
N.D. Iowa,
Eastern–Dubuque Division.

Oct. 27, 1995.

Mary Beth McGee, Eugene Cohen, Jessica N. Cohen, U.S. Department of Justice, Anti-Trust Division, Washington, DC, Lawrence D. Kudej, Assistant United States Attorney, Cedar Rapids, IA, for plaintiff.

David A. Ettinger, Howard B. Iwrey, Honingman Miller Schwartz & Cohn, Detroit, MI, James D. Hodges, Jr., Steven J. Pace, Shuttleworth & Ingersoll, Cedar Rapids, IA, for defendants.

## OPINION and ORDER

MELLOY, Chief Judge.

The United States has brought this action under the antitrust laws. The defendants, Mercy Health Services and Finley Tri–States Health Group, Inc. own Mercy Health Center (Mercy) and Finley Hospital (Finley), respectively. Mercy and Finley are the only two general acute care hospitals in Dubuque, Iowa. The two hospitals have agreed to form a partnership, Dubuque Regional Health Services (DRHS), which all parties acknowledge constitutes a merger for purposes of antitrust analysis. On June 10, 1994, the government filed a complaint seeking injunctive relief against the merger as a violation of § 7 of the Clayton Act, 15 U.S.C. § 18, and of § 1 of the Sherman Act, 15 U.S.C. § 1. The parties agreed to waive a preliminary injunction hearing in order to proceed to trial on the matter. After expedited discovery, the matter was tried to the bench. Two weeks of testimony was heard and several hundred items were moved into evidence.

## I. Findings of Fact

### A. Hospital Background

Dubuque is situated within Dubuque County, Iowa, which in 1993 had a population of 86,403. Dubuque lies on the Mississippi River, at a point where Iowa adjoins the southwestern portion of Wisconsin and the northwestern portion of Illinois.

Mercy is an acute care hospital which, in 1994, had approximately 320 staffed beds, 9980 acute care patient discharges and an average daily census of 127. Mercy's acute care commercial discharges for 1994 were estimated to be 3622 and the average daily acute care commercial census was 44. Finley is also an acute care hospital and, in 1994, was estimated to have 124 staffed beds, 5247 acute care patient discharges and an average daily census of 63. Finley's acute care commercial discharges for 1994 were estimated to be 2175 and the average daily acute care commercial census was 21.

There are seven rural hospitals in the area: Galena–Stauss Hospital in Galena, Illinois, 15 minutes from Dubuque, has 25 licensed beds and an average daily census of 3. Southwest Health Center in Platteville, Wisconsin, 30 minutes from Dubuque, has 35 licensed beds and an average daily census of 11. Lancaster Memorial Hospital in Lancaster, Wisconsin, 30 minutes from Dubuque, has 35 licensed beds and an average daily census of 10. Delaware County Memorial Hospital in Manchester, Iowa, 40 minutes from Dubuque, has 58 licensed beds and an average daily census of 12. Jackson County Public Hospital in Maquoketa, Iowa, 30 minutes from Dubuque, has 99 licensed beds and an average daily census of 12.4. Guttenberg Memorial Hospital in Guttenberg, Iowa, 40 minutes from Dubuque, has 37 licensed beds and an average daily census of 7. Finally, Central Community Hospital in Elkader, Iowa, 60 minutes from Dubuque, has 29 licensed beds and an average daily census of 3–4.

These hospitals primarily serve patients who are closer to the rural hospital than to any other hospital. The rural hospitals mainly provide primary care services and do not provide the breadth of services Mercy and Finley offer. Guttenberg provides the largest array of services in that it offers 68% of the same Diagnosis Related Groups (DRGs)[1] Mercy and Finley provide. Galena–Stauss has the smallest array of services, providing care for only 11.5% of the same DRGs Mercy and Finley provide.

---

1. A DRG is a numerical code indicating the treatment provided to a patient or his diagnosis and severity of his illness.

There are several regional hospitals within 70 to 100 miles of Dubuque which generally offer the same or greater range of services as provided by Mercy and Finley. Allen Memorial Hospital in Waterloo, Iowa has 194 staffed beds and an average daily census of 145. Covenant Medical Center in Waterloo, Iowa has approximately 322 staffed acute care beds with an average daily census of 173. St. Luke's Methodist Hospital in Cedar Rapids, Iowa has 441 staffed beds with an average daily census of 284. Mercy Medical Center in Cedar Rapids, Iowa has 353 staffed beds and an average daily census of 193. St. Mary's Medical Center in Madison, Wisconsin has 345 staffed beds and an average daily census of 265. Freeport Memorial Hospital in Freeport, Illinois has 143 staffed beds and an average daily census of 70. University of Wisconsin Hospital and Clinics in Madison, Wisconsin has 496 staffed beds and an average daily census of 386. Meriter Hospital in Madison, Wisconsin has 429 staffed beds and an average daily census of 258. The University of Iowa Hospitals and Clinics in Iowa City, Iowa (UIHC) has 868 staffed beds and an average daily census of 677.

Mercy and Finley's patient bases are composed of individuals covered by government insurance programs, traditional indemnity insurance and managed care payers. Managed care payers include health maintenance organizations (HMO's), and preferred provider organizations (PPO's). HMO's generally charge a set fee which covers all of an enrollee's health care needs, including hospitalizations. HMO's generally restrict the doctors and hospitals from which an enrollee can receive care to those physicians and hospitals providing a discounted rate to the HMO. HMO's often work with the hospitals when an enrollee is hospitalized to insure that the costs of the hospitalization remain as low as possible. HMO's may have their own clinics to which enrollees are obligated to go for office visits and most outpatient needs. HMO's generally stress preventative care and require preapproval prior to being hospitalized in order to keep the rate of hospitalizations low.

PPO's generally negotiate discounted rates with physicians and hospitals and then require their enrollees to receive their care from the discounted care providers or risk being denied reimbursement. PPO's generally do not have their own clinics and do not stress preventative care. In contrast to the managed care payers, the indemnity health insurers have not traditionally attempted to gain discounted rates from physicians or hospitals.[2] Instead, these traditional insurers cover a percentage of the health care costs with the remainder being paid by the insured. HMO's and PPO's have only recently established themselves in Iowa, but already 25% of Mercy and Finley's patients are covered by managed care payers. Of the remaining 75% of Mercy and Finley's inpatients, 50% are covered by Medicare and Medicaid and the other 25% are covered by traditional indemnity insurance.

A hospital will discount its stated charges to managed care payers in order to entice the managed care entity to send more enrollees to their hospital for inpatient care. Mercy currently gives discounts to the following managed care entities: Medical Associates, Heritage National Health Plan, Self–Insured Systems Corporation (SISCO), Alliance Select PPO (a Blue Cross plan), HMO of Wisconsin, Wisconsin Education Association Insurance and the Affordable Health Plan. Finley contracts with Blue Cross/Blue Shield of Iowa, Alliance Select PPO Program (a Blue Cross plan), Heritage National Health Plan, Inc., Heritage Preferred, Medical Associates HMO, HMO of Wisconsin, Blue Cross of Illinois PPO, BeefAmerica Operating Co., ProAmerica Network, Inc., American Health Care Advisory Association, Hospice of Dubuque County, and Collaborative Medical for Religions (a charitable contribution).

Medical Associates is a physician-owned medical practice which operates the Medical Associates HMO in the Dubuque area. The HMO has approximately 30,000 enrollees. The Medical Associates HMO accounts for 11–12% of Mercy's net revenues. Physicians

---

2. The traditional indemnity insurers are now beginning to demand and receive discounts. In addition, traditional insurers, such as Blue Cross/ Blue Shield, have formed their own PPO or HMO.

employed by Medical Associates refer patients to Mercy for inpatient and outpatient care constituting approximately 80% of Mercy's yearly revenue. Heritage National Health Plan operates a PPO which covers 5,000 lives in the Dubuque area. Nationally it covers 280,000 persons. It accounts for 2–3% of Mercy's net revenues. SISCO is a third-party payer which administers self-insured employee health plans and also contracts for reduced rates for some of its employer-customers. Blue Cross has a state-run managed care plan in which it offers the hospital a contract on a "take it or leave it" basis. The hospital can either agree to the stated rates or not be on the plan's preferred provider list. It accounts for 8–9% of Mercy's net revenues. Affordable accounts for less than 1% of Mercy's revenues. HMO Wisconsin accounts for less than 0.5% of Mercy's revenues. Medicare and Medicaid account for 46–47% of Mercy's net revenues. Traditional indemnity insurance accounts for 26% of Mercy's revenues.

Medical Associates has a clinic in Dubuque in which it sees patients for regular office visits. It also operates an outpatient clinic in Dubuque which directly competes with Mercy and Finley for outpatient procedures. In addition to its Dubuque Clinic, Medical Associates has permanent facilities in Bellevue, Iowa; East Dubuque, Illinois; and Galena, Illinois. It operates outreach clinics in Bellevue, Iowa; Dyersville, Iowa; Lancaster, Wisconsin; Maquoketa, Iowa; Platteville, Wisconsin; Boscobel, Wisconsin; Elkader, Iowa; Guttenberg, Iowa; Manchester, Iowa; Oelwein, Iowa; Darlington, Wisconsin; Clinton, Iowa; and Monticello, Iowa. These outreach clinics are primarily conducted in order to obtain secondary referrals for Medical Associates' specialists.

## B. Health Care Market Trends

Traditionally, hospitals competed on the basis of amenities and perceptions of quality. Only in the last ten to fifteen years have hospitals begun to compete on the basis of price. To a large degree, this competition has occurred because of the arrival of managed care. These large purchasers shop on the basis of price and are able to induce

hospitals to discount stated charges in return for the managed care payer's promise to direct a larger volume of patients to the hospital. Hospitals must employ cost containment measures in order to become more cost efficient so that they can afford to give discounts to the managed care payers. Competition for Medicare, Medicaid and traditional indemnity patients still occurs on the basis of amenities and perceptions of quality.

Managed care entities are capable of inducing their enrollees to receive inpatient care at a specific hospital. The entity does this in one of the following ways: (1) by only paying the hospitalization costs if the enrollee is treated at a specified hospital, or (2) by requiring the enrollee to pay a higher percentage of the enrollee's hospitalization costs (a co-pay) if the enrollee chooses to be hospitalized at a non-preferred hospital. Managed care entities are gaining sophistication in their ability to induce patients to be hospitalized at a preferred hospital. However, the managed care entities do not always show price sensitivity when they establish requirements. For example, Medical Associates may be charged a lower rate by one hospital for a certain DRG, however, the physicians who admit the patients may not be aware of the rate differential and consequently do not encourage patients to go to the cheaper hospital.

Traditionally, when people decided where to receive inpatient care, they considered the following factors: where their physician had hospital privileges and could therefore take care of them during the hospitalization; what hospital was convenient; the reputation of the hospital; and the amenities the hospital offered. Patients have only recently added out-of-pocket expenses to this list. (Traditional indemnity insurance covered a specific portion of the fees no matter which hospital was utilized and patients generally had little knowledge of whether hospital prices varied for their specific hospitalization needs.)

The advent of managed care has resulted in individuals also considering what their out-of-pocket expenses will be. Under traditional indemnity insurance a certain percentage of a hospitalization is covered without regard to the hospital used. Managed care enroll-

ees are much more aware of their out-of-pocket expenses resulting from a hospitalization because the policies generally state that expenses incurred at certain hospitals will either not be covered or will require a higher co-pay.

People who continue to be covered by either traditional insurance or by Medicare and Medicaid remain largely insensitive to price differentials. The government dictates hospital fees for the care of Medicare and Medicaid patients, and such fees are often below the cost of providing the services. This causes "cost shifting" of the costs of these services to non-Medicare and non-Medicaid patients. Patients covered by traditional indemnity insurance have been charged full charges which take into account the need to cost shift. Even though managed care groups negotiate with the hospitals for rates below full charges, the rates are greater than those charged Medicare and Medicaid patients and include some cost shifting.

Price competition is important among the managed care groups. Generally, the managed care payer will negotiate the best rates and the greatest discounts possible with area hospitals and physician groups. Based on the rates obtained, the managed care payer determines the premium it must charge enrollees for services. The managed care group next approaches businesses to try to convince them to offer their managed care plan to their employees. Thirty-five to 40% of the managed care premium is due to inpatient hospital charges, so the rates negotiated with the hospitals significantly impact the premium charged by the managed care payer and affects the cost competitiveness of the managed care entity receiving the discount.

Hospitals contract at discounted rates with the managed care entity when they feel the managed care payer can induce its enrollees, through financial incentives or otherwise, to use the contracting hospital. A hospital will generally only contract with the managed care entity if it feels that (1) by giving a discount, the managed care entity will shift a higher volume of patients to the hospital, or (2) by refusing to give a discount, the managed care entity will shift a significant volume of patients away from the hospital.

Managed care plans influence which physicians and hospitals an enrollee chooses by offering incentives to use certain care providers (i.e., a reduction in co-pay or a total waiver of co-pay), by requiring a co-pay if the enrollee uses a different care provider or hospital, or by simply requiring the enrollee to use designated hospitals and care providers to receive reimbursement.

Along with the rise of managed care has come the increased use of outpatient services for procedures which traditionally required overnight hospitalization. The length of hospital stays are also becoming significantly shorter because of the increased use of home care and because managed care payers closely monitor the length of time an enrollee is hospitalized. This results in less hospital utilization and a decrease in the average daily census. Because hospitals have high fixed costs, the loss of patient volume requires hospitals to broaden their service area in order to maintain patient census and resulting cash flow.

Prior to the trend in shorter and fewer hospitalizations and to the advent of cost competition, hospitals had their own "catchment area" from which they drew their patients and from which other hospitals generally did not try to encroach upon the residing population. The main competition between regional hospitals was in the "fringe area," the area half-way between two regional hospitals. However, the competitive market has changed and is continuing to change at a rapid pace.

Hospitals, needing to maintain their patient volume, have begun to establish outreach efforts in the fringe areas as well as deep in the heart of what used to be considered another hospital's catchment area. The efforts include the establishment of hospital owned clinics and the purchase of physician practices in towns up to 50–60 miles from the hospital. These clinics have succeeded in capturing patients and referring them to their associated hospital for inpatient care.

Outreach efforts also include clinics established by private physicians' groups. The physician clinics are used to broaden the referral base for the clinic's various special-

ties. The clinics refer patients back to the hospital where the physicians have admitting privileges for inpatient and outpatient services. Consequently, when a physicians' group extends its market area by opening an outreach clinic, it also extends the market area of the hospital with which the group is associated. Once an outreach clinic is established, the hospital and specialty referral patterns from the community where it is located change significantly within a short period of time (often within two months). Clinics can generally be established in a matter of weeks as they are often opened in existing hospitals or clinics. Both hospital and physician-owned clinics have proven they induce outreach patients to receive hospital care at the associated hospital, even if another regional hospital is closer.

There is a great deal of evidence showing that these national trends exist in the Dubuque area. Mercy's inpatient volume decreased by approximately 15% from 1990 to 1994. In order to maintain its present patient volume and revenues, Mercy must gain market share in what it considers its "secondary market," the area outside of Dubuque County. This can only be done on a significant level by establishing outreach clinics. Mercy has not established any of its own outreach clinics, but depends on the managed care payers which use Mercy to do so—primarily Medical Associates.

## C. Other Findings of Fact

Additional findings of fact are made under the Conclusions of Law section and throughout the legal analysis. In addition, attached as Appendix A, are the facts to which the parties have stipulated.

## II. *Conclusions of Law*

### A. Anti-trust Analysis

■ Section 7 of the Clayton Act provides, in part, that "no person ... shall acquire the whole or any part of the assets of another person ... where ... the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18 (1973 & Supp.1995); *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 589, 77 S.Ct. 872, 875, 1 L.Ed.2d 1057 (1957) (Section 7 is

"designed to arrest in its incipiency ... the substantial lessening of competition...."). To meet the requirement of Section 7, the government must show a reasonable probability that the proposed transaction would substantially lessen competition in the future. *FTC v. University Health Inc.*, 938 F.2d 1206, 1218 (11th Cir.1991); *FTC v. Warner Communications, Inc.*, 742 F.2d 1156, 1160 (9th Cir.1984). Section 1 of the Sherman Act requires the same analysis. 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 304c., at 9 (1995); *United States v. Rockford Mem. Corp.*, 898 F.2d 1278, 1281–86 (7th Cir.), *cert. denied*, 498 U.S. 920, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990).

■ To determine whether there is a reasonable probability of a substantial lessening of competition, the courts have focused on whether the merger will cause the merged entity to have enough market power such that it could profitably increase prices. Whether the merger will cause an anticompetitive effect is not "the kind of question which is susceptible of a ready and precise answer in most cases." *United States v. Philadelphia National Bank*, 374 U.S. 321, 362, 83 S.Ct. 1715, 1740, 10 L.Ed.2d 915 (1963). Generally, the plaintiff attempts to prove its case by showing that the merged entity will have a large percentage of the relevant market such that, either individually or through collusion, its hold over the market will enable it to profitably raise prices above competitive levels. The government may make a prima facie showing that the merger will result in anticompetitive effects by showing that the merged entity will have an undue share of the relevant market. *Id.*, at 363, 83 S.Ct. at 1741; *University Health, Inc.*, 938 F.2d at 1218. Thus before a court can determine the effect of a merger on competition, it must first define the relevant market.

■ The relevant market is defined by identifying those "producers that provide customers of defendant[s]' ... firms with alternative sources for the defendant[s]' product or service." 2A Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, Antitrust Law ¶ 530a, at 150 (1995). A properly defined market excludes other potential sup-

pliers (1) whose product is too different (product dimension of the market) or too far away (relevant geographic market) and (2) who are not likely to shift promptly to offer defendants' customers a suitably proximate alternative. *Id.* "Those who can readily shift into offering such a product are in the market." *Id.*

Although a great deal of emphasis is placed on market share statistics, they are not conclusive indicators of anticompetitive effects. *United States v. General Dynamics,* 415 U.S. 486, 498, 94 S.Ct. 1186, 1194, 39 L.Ed.2d 530 (1974). If the government is able to make a prima facie case, the defendants can overcome the presumption of illegality by showing that the market-share analysis gives an inaccurate reflection of the acquisition's probable effect on competition within the relevant market. *United States v. Citizens & Southern Nat'l Bank,* 422 U.S. 86, 120–21, 95 S.Ct. 2099, 2118, 45 L.Ed.2d 41 (1975). To rebut the government's case, the defendants may produce " '[n]onstatistical evidence which casts doubt on the persuasive quality of the statistics to predict future anticompetitive consequences.' " *University Health Inc.,* 938 F.2d at 1218 (quoting *Kaiser Aluminum & Chem. Corp. v. FTC,* 652 F.2d 1324, 1341 (7th Cir.1981)). Factors which courts have previously considered to be relevant include " 'ease of entry into the market, the trend of the market either toward or away from concentration, and the continuation of active price competition.' " *Id.* When determining whether a merger will have an anticompetitive effect, the court must view the merger functionally within the context of its industry's " 'structure, history, and probable future.' " *General Dynamics,* 415 U.S. at 498, 94 S.Ct. at 1194 (quoting *Brown Shoe v. United States,* 370 U.S. 294, 322 n. 38, 82 S.Ct. 1502, 1522 n. 38, 8 L.Ed.2d 510 (1962)).

If the defendant is successful in rebutting the government's statistical evidence, the government then has the burden of presenting additional evidence that the merger will lessen competition and this burden " 'merges with the ultimate burden of persuasion, which remains with the government at all times.' " *University Health Inc.,* 938 F.2d at 1219 (quoting *United States v. Baker Hughes Inc.,* 908 F.2d 981, 983 (D.C.Cir. 1990)).

## B. Relevant Product Market

The parties have agreed that the relevant product market is acute care inpatient services offered by both Mercy and Finley. This definition excludes inpatient psychiatric care, substance abuse treatment, rehabilitation services, and open-heart surgery. This limits the product market to those services for which Mercy and Finley currently compete for inpatients.

## C. Relevant Geographic Market

The burden is on the government to prove the relevant geographic market. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, ——, 113 S.Ct. 884, 890, 122 L.Ed.2d 247 (1993). The relevant market is hotly disputed by the parties. The government asserts that the geographic market includes Dubuque County, Iowa and a half-circle with a 15 mile radius extending from Dubuque County's eastern edge into Illinois and Wisconsin. This geographical area would include Mercy, Finley and Galena–Stauss Hospital. Currently, 88% of the patients within the market use the three hospitals within the market. Only about 2% of the 88% use Galena–Stauss; the remainder use Mercy and Finley. Approximately 76% of the patients at the three hospitals come from within the market.

The defendants assert that the proper geographic market includes Mercy, Finley, the seven closest rural hospitals and the regional hospitals situated in Cedar Rapids, Waterloo, Iowa City, Davenport, and Madison. Mercy and Finley's market share of the patients within this geographical area is approximately 10%. The government does not contest that if this is the relevant market, the merger is not illegal.

The parties dispute whether the government has properly defined the relevant geographic market by trying to show whether DRHS could (1) profitably raise prices by 5% to managed care entities, or (2) profitably raise prices by completely eliminating pres-

ent discounts to managed care entities. In the event the court finds the government has not met its burden as to the proposed geographic market, the government has proposed an alternative market encompassing only the City of Dubuque.

The government defined its market based on (1) the views of the major purchasers of health care services in the Dubuque area, (2) where physicians have privileges, (3) the views of physicians, and (4) patient flow data. Looking at the views of the major managed care providers in the Dubuque area, the government finds it significant that Medical Associates HMO and the Heritage Plan both feel their health care plans must include one of the Dubuque hospitals in order for the plan to be marketable to Dubuque employers. The government argues this is evidence that there is no market substitute for the Dubuque hospitals.

The government then looked at the overlap of physicians who were currently on staff at the area hospitals. The government showed that there is a great deal of physician staff overlap between the staffs of Mercy and Finley, but very little between the rural hospitals and Mercy or Finley. Seventy-six percent of Mercy's physicians were shown to be on staff at Finley and over 90% of Finley's physicians were on staff at Mercy. The government concludes from these statistics that (1) those patients who currently use a physician with privileges at Mercy and Finley cannot switch to a rural hospital due to their loyalty to their physician and their physician's inability to admit them at a rural facility, and (2) Mercy and Finley are seen by physicians as being comparable hospitals as physicians are willing to work out of either of them. By contrast, Dubuque physicians are not willing to work out of the rural hospitals, hence the rurals are not comparable and therefore they are not substitutes for Mercy and Finley.

The government also asserts that Dubuque physicians would not seek privileges at the rural hospitals as they do not see the rural hospitals as being able to provide the broad range of services which the majority of their patients require and because the rurals are not adequately staffed and do not have the

equipment to do many inpatient surgical procedures.

The government then goes on to look at the inflow and outflow of patients from the market. The "Elzinga–Hogarty" test was employed by the government to argue that the relevant geographical market was quite limited. This test looks at the empirical data to determine (1) the area from which the hospitals draw their patients and (2) where the residents in that area go for hospital care. When both numbers are at 90%, the market definition is said to be "strong". Numbers at 75% are said to constitute a "weak" market definition. Robert Pitofsky, *New Definitions of Relevant Market and the Assault of Antitrust*, 90 Columbia Law Rev. 1805 (1990); Elzinga & Hogarty, *The Problem of Geographic Market Delineation Revisited: The Case of Coal*, 23 Antitrust Bull. 1, 2 (1978).

Looking at the government's proposed market definition—Dubuque County and a fifteen mile radius into Illinois and Wisconsin—76% of Mercy's and Finley's inpatients come from within this defined market, and 88% of those residing within the market seek care within the market. Shrinking the market to include only the City of Dubuque, 55% of Mercy and Finley's inpatients come from within the market and 91% of those residing in Dubuque seek hospital care at either Mercy or Finley. Defining the market as a twenty-five mile radius around Dubuque, 85% of Mercy's and Finley's patients come from within the market and 89% of those persons within the market seek care inside the market. Broadening the market to a 35 mile radius around Dubuque, 89% of Mercy and Finley's inpatients come from within the market and 82% of the persons within that market seek care at Mercy or Finley.

Finally, the government asserts that the regional hospitals are not in the relevant geographic market as they only compete for patients at the "fringes," the area located at the midpoint between Dubuque and a particular regional hospital. The government reasons that people will not travel greater distances than necessary for inpatient care and, therefore, only those patients at the midway point between two regional hospitals could be

induced to switch hospitals due to price concerns. The government concludes that DRHS would have the ability to raise prices as the rurals do not act as a competitive alternative to DRHS and the regional centers are only a competitive force at the fringes of Mercy's and Finley's service areas and therefore could not induce enough people to switch hospitals to defeat a price rise by DRHS.

The defendants criticize the government's market definition as being dependent on incorrect assumptions, and as not accounting for current market trends. The defendants also assert that the government's geographical market is too small because a 5% price increase would be easily defeated by patients who would choose to travel to other hospitals for cheaper care. In reaching this result, the defendants challenge the government's assumptions of strong doctor-patient loyalty, that outreach clinics only have an effect on hospital use at the fringes of a hospital's service area, and that there are significant barriers to entry into this market.

### 1. Analysis of the Relevant Geographic Market

■ The court finds that the government's case rests too heavily on past health care conditions and makes invalid assumptions as to the reactions of third-party payers and patients to price changes. The government's case also fails to undergo a dynamic approach to antitrust analysis, choosing instead to look at the situation as it currently exists within a competitive market.

■ In determining the relevant geographic market, the court must determine "the market in which the seller operates and to which the purchaser can practicably turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1960); *Philadelphia National Bank*, 374 U.S. at 359, 83 S.Ct. at 1739. The analysis must focus not merely on where patients have gone for acute inpatient services, but where they could practicably go should DRHS become anticompetitive. *Bathke v. Casey's General Stores, Inc.*, 64 F.3d 340, 345 (8th Cir.1995); *Morgenstern v. Wilson*, 29 F.3d 1291, 1295–1296 (8th Cir.

1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1100, 130 L.Ed.2d 1068 (U.S.1995). This requires a fluid analysis. It is not sufficient to take a snapshot of the current situation and define the relevant geographic market to be synonymous with the current service areas of the defendant hospitals. *See, Bathke,* 64 F.3d at 345; *Morgenstern,* 29 F.3d at 1295; *In the Matter of Hospital Corporation of America,* 106 FTC 361, 466 (1985), *aff'd, Hospital Corporation of America v. FTC,* 807 F.2d 1381 (7th Cir.1986), *cert. denied,* 481 U.S. 1038, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987); *Drs. Steuer & Latham v. Nat. Med. Enterprises,* 672 F.Supp. 1489, 1511 (D.S.C. 1987), *aff'd,* 846 F.2d 70 (4th Cir.1988).

In order to determine the actual geographic market, current market behavior must be put into a dynamic analysis which looks at possible competitive responses from other hospitals, third party payers and consumers. In this light, it is important to note that the government's reliance on the Elzinger–Hogarty test is merely a starting point—it states where Mercy and Finley are currently attracting patients and the area from which most patients seek services from either Mercy or Finley. This is the snapshot of the market as it exists under current conditions and does not pretend to answer the question of what would happen if there was an attempt to exercise market power by one of the market participants. *See* Robert Pitofsky, *New Definitions of Relevant Market and the Assault of Antitrust,* 90 Colum.L.Rev. 1805 (1990).

The government's case in general makes the mistake of relying too heavily on past conditions in the hospital industry and discounts the effects of outreach efforts, the strong emphasis that regional hospitals place on expanding their service areas and the willingness of managed care enrollees to make changes in their health care for financial reasons.

The government's case relies on several assumptions and conclusions that are not supported by the evidence. One of the assumptions is that there is strong doctor-patient loyalty. This assumption supports the argument that patients cannot be enticed

to use a non-Dubuque hospital because the patient already has a Dubuque doctor to whom the patient is very loyal.

There are several problems with this assumption. First, the evidence shows that many hospital patients do not have an established physician relationship, or, are admitted by a specialist who is not the patient's regular physician.

Secondly, the evidence does not support a finding of strong patient-physician loyalty that prevents patient shifting for financial reasons. The medical professionals testified there is a large amount of patient shifting that occurs when an employer changes or modifies a health insurance plan so as to encourage usage of a particular physician or group of physicians. Testimony also shows that managed care entities have been very successful in enrolling patients in HMO's that require switching physicians or agreeing to be seen by any available physician.[3]

The government's assertion that the outreach clinics have little effect on hospitalization patterns is also erroneous. There are several communities where referral practices have been dramatically altered due to outreach efforts. Most notably Manchester, Independence and Clarion, Iowa. While the effect of the outreach clinics has not been quantified, the fact that they are established is significant as it is only through the generation of inpatient and outpatient referrals that these clinics become profitable. Outreach efforts have been characterized by the regional hospitals as being pivotal in their efforts to expand patient volume at a time when all other trends are causing them to lose volume. In other words, without growth in these areas most hospitals acknowledge they would incur a significant decrease in revenue. The start-up of outreach clinics cannot be justified based solely upon the direct business they obtain on site. They are economically justified due to the increased referrals they bring to the physicians and hospitals sponsoring them. Outreach clinics generally attract patients from a fifteen mile radius and these clinics have been established within twenty-five miles of Dubuque.

18.8% of Mercy and Finley's patients come from within fifteen miles of an outreach clinic associated with another regional hospital.

The government attempts to argue that outreach clinics are only effective in shifting patients from the fringe areas to other hospitals as people will not agree to be hospitalized at a hospital a significant distance away from their home and family. The government argues that most hospitalizations require two pre-operative visits to the hospital, the actual hospitalization and two or three post-operative visits to the hospital and patients will not want to incur the expense and inconvenience of travel for these visits. However, the evidence was clear that one reason why the outreach clinics are so effective in altering hospitalization practices is because the pre- and post-operative visits take place at the outreach clinic and the patient is only required to travel to the hospital for the actual surgical procedure.

In fact, people will use outreach clinics which are associated with hospitals that are a significant distance from their hometown. To illustrate, the Platteville and Lancaster areas are 25 miles from Dubuque and sixty to seventy miles from Madison, Wisconsin, yet Medical Associates, which refers persons back to Dubuque for inpatient care, meets strong competition in these communities from the Dean Clinic which refers its patients to St. Mary's Hospital in Madison.

The fact that the residents of southwest Wisconsin are willing to drive to Madison for their inpatient needs also shows that the government's assumption that persons within twenty-five miles of Dubuque will only go to Dubuque for their inpatient needs is an incorrect assumption. The government has also failed to account for the fact that there are several zip codes within 25 miles of Dubuque which currently send over one-third of their inpatients to other hospitals. Looking at the zip codes encompassing Cuba City, Wisconsin; Galena, Illinois; New Vienna, Iowa; Potosi, Wisconsin; and Hazel Green, Wisconsin, there were 930 discharges in a six month period from these zip codes and only

---

**3.** Medical Associates HMO does not guarantee the availability of a particular physician for office visits and John Deere has been successful nationally even though it has a limited panel of doctors.

560 were discharged from Mercy or Finley (60.2%). 179 of these discharges were to hospitals other than Mercy, Finley, the seven rurals or the University of Iowa (19.2%). Obviously, these persons are already being attracted to hospitals outside the immediate area. Discharges from these five zip codes account for 7.7% of Mercy and Finley's total discharges.

The main point made by the government which the court does agree with is the inability of the rural hospitals to prevent DRHS from acting in an anticompetitive manner. The government argues that it would not be feasible for more patients to use the rural hospitals as the rural hospitals are not equipped to handle anything but the least complicated hospitalizations. The defendants counter that the rural hospitals are a practicable alternative as they have a great number of empty beds and are capable of meeting the needs of a significant number of inpatients.

Due to the high utilization rates of some of the rurals by those in the same zip code as the hospital, many of the rurals can apparently care for a wide range of diagnoses. For example, in the zip code encompassing Guttenberg, Iowa, where Guttenberg Hospital lies, 178 out of 269 hospitalizations were at the Guttenberg hospital (66.1%). Further, Guttenberg Hospital has cared for inpatients hospitalized for 68% of the DRGs for which Mercy and Finley admit patients. However, in the zip code encompassing Galena, Illinois, where Galena–Stauss lies, only 93 out of 340 hospitalizations were at Galena–Stauss Hospital (27.3%) and Galena–Stauss has admitted patients for only 27% of the DRGs for which Mercy and Finley admit patients. Therefore, the rural hospitals have a wide divergence as to each's ability to care for more patients than are currently hospitalized there.

This evidence shows that the rural hospitals are technically qualified to meet the hospitalization needs of more patients than currently choose to go there. However, other barriers exist to prevent greater utilization of the rurals, the largest barrier being individual attitudes toward the rurals. Persons living any distance from the rurals simply do not seek them out for care. For example, despite the high utilization rate by the population living within the same zip code as Guttenberg Hospital, in the rest of Clayton County, in which the Guttenberg hospital lies, only 92 out of 579 hospitalizations were at the Guttenberg Hospital (15.8%). In all of Jo Daviess County, in which Galena, Illinois is a part, there were 63 out of 702 hospitalizations at Galena–Stauss (8.9%). Further, a survey done by Jackson County Public Hospital in Maquoketa found they were significantly used by persons within 20 miles of the hospital, but not by persons of any greater distance.

Another barrier to the rurals taking on a greater patient volume is the difficulty the rurals have in obtaining qualified doctors and nursing staff willing to live and work in a rural community. It is not at all apparent that the rurals could attract the staff necessary to expand patient volume.

Further evidence that the rurals could not significantly expand their utilization rate is that Mercy and Finley do not consider the rurals as competitors. Both Mercy and Finley look to the rurals as a source of referrals for the services that the rurals do not provide and try to cooperate with the rurals in order to capture some of this referral business. While the rurals could conceivably capture some patients should the managed care payers give incentives for their use, it does not appear to be a large percentage of the current population using Mercy and Finley.

## 2. 5% Price Increase

The government also argues that there are no competitors who could defeat a 5% price increase by DRHS and that therefore, the merger would result in an anticompetitive effect. The 1984 Merger Guidelines instituted the 5% test—suggesting that if a merged entity could sustain a 5% price rise for approximately one year, the merger should be enjoined as a violation of the antitrust laws. The government concluded that a 5% price increase would be profitable, in large part, due to the following assumptions: (1) people have strong loyalties to their doctors and will not switch hospitals as this

would entail switching doctors, (2) the outreach clinics only influence behavior in the "fringe areas" between two regional hospitals, and (3) persons within twenty-five miles of Dubuque will only use Dubuque hospitals.

Both parties agreed that for a 5% price increase to be unprofitable, DRHS would have to lose 8% of its present population. The government asserts that this will not happen as (1) at most, 4% of those within twenty-five miles of Dubuque would shift to a non-Dubuque hospital, and (2) at most, 3.2% of the 13% of Dubuque patients living outside this 25 mile radius might shift. The government argues that those within twenty-five miles of Dubuque would not shift as they would not travel outside of Dubuque for health care needs partly because they would find it inconvenient, and partly because a shift would necessitate changing physicians which most would be unwilling to do.

The government broke down the 13% of Mercy and Finley's patients who reside outside the 25 mile radius into categories and found that the following persons would be unlikely to switch in the event of a 5% price rise: (1) the .6% admitted who reside completely outside the area (e.g. California), (2) the 1.2% who are admitted through the emergency room whom the government assumes happened to be in the Dubuque area when their emergency arose, (3) the 1.1% who are admitted by Medical Associates physicians because these patients will not change hospitals due to their loyalty to their physicians and because their physicians only have privileges at Mercy and Finley, and (4) the 3.6% who were admitted by their Dubuque primary care physician, who the government assumes will not switch because they have ties to Dubuque and that particular doctor. The government asserts of the remaining 6.5% who do not fall in any of the above categories, only half, or 3.2% would switch.

The court finds the government's numerical conclusions to be incorrect, again due to the government's assumption of strong patient-physician loyalty and the government's erroneous belief that persons within twenty-five miles of Dubuque will not travel outside of Dubuque for hospital care. Adding in the percentages which the government excluded due to these assumptions puts the total of those likely to switch in the event of a 5% price rise at a number higher than the 8% necessary to make the price rise unprofitable.

### 3. Elimination of Managed Care Discounts

██ The government contends the more likely scenario is that DRHS would reduce or eliminate all current discounts to managed care entities resulting in a 15–30% increase in prices. The evidence was that such a price increase would have to be countered by a 20–35% loss of patients to make such a price increase unprofitable. The government asserts that with a total abandonment of managed care discounts, to defeat a price rise, DRHS would have to lose all of its patients residing outside of the government's proposed market area (24%) and perhaps a number of those residing within the market area. The government argues that it is inconceivable that such a large exodus from the Dubuque hospitals would occur.

The government presumably relies on its assumptions that persons within twenty-five miles of Dubuque will not shift to other facilities, that outreach clinics are largely irrelevant to the analysis, and that there is strong doctor-patient loyalty preventing shifting. For the reasons stated above, the court has already found that these assumptions are erroneous.

The government continues to fail to look at the merger within the context of current market trends. All evidence is that there is a great deal of competition for health care dollars—including stiff competition between the managed care entities. As hospitalization costs account for approximately 40% of an HMO's fee, a 15–30% price increase in hospitalization rates would equate to a 6–12% increase in the cost of an HMO. HMOs which could avoid this increase would be much more cost competitive and presumably would be able to attract more enrollees. Therefore, if DRHS acted in a noncompetitive manner, an HMO that could successfully induce Dubuque area residents to use alternative hospitals would be at a significant cost advantage.

The government asserts that those within twenty-five miles of Dubuque cannot be induced to travel outside of Dubuque for health care; however, the court finds to the contrary for several reasons: (1) a significant portion of the population already chooses to go outside Dubuque for health care, (2) managed care entities have successfully shifted patients in the past, and (3) managed care enrollees are increasingly willing to travel for financial savings.

Turning to the first point, already, a significant number of Dubuque residents use the University of Iowa Hospitals and Clinics ("UIHC"), a ninety mile drive, due to quality concerns. The government asserts that these persons are only going to the University of Iowa for health care that cannot be obtained in Dubuque, and supports this assertion by testimony from doctors stating that they only send patients to the UIHC for care unavailable in Dubuque. However, 63% of Dubuque residents using the UIHC are self-referrals who are not going to the UIHC on the referral of a Dubuque doctors. Further, the zip code data shows a widely varied use of the UIHC across zip codes, indicative of the defendants' position that persons are not going only for care unavailable in Dubuque. Presumably, if persons were only using the UIHC for care unavailable in Dubuque, the percentages of persons going to the UIHC from each zip code would be fairly equal.

There was also testimony that a plastic surgeon from Cedar Rapids successfully induces Dubuque residents to travel to Cedar Rapids for plastic surgery by offering them lower prices on the surgery and hospitalization. Plastic surgery is not often covered by private health insurance and therefore persons wanting plastic surgery have to pay for the full cost out of their own pocket.

A final example of persons traveling outside of Dubuque for health care needs is that of a Dubuque physician who successfully directs cardiac patients needing catheterization, angioplasty and open heart surgery to Iowa City. Although this is reportedly done for political reasons and not for price considerations, it nevertheless does show that persons can be induced to travel from the Du-

buque area for inpatient care available in Dubuque.

There is also evidence that managed care entities can successfully induce Dubuque residents to use other regional hospitals for their inpatient needs. Heritage shifted patients in need of open heart surgery and substance abuse treatment from Dubuque to Waterloo and Davenport in a successful attempt to obtain lower prices from Mercy in these service areas. The government vehemently argues that this evidence is irrelevant as these are services outside the product market and that there is no evidence that people who would switch for these services would switch for the services within the relevant product market. The court finds, however, that it may rely on this evidence for two reasons: (1) the evidence is that it is generally harder to induce people to travel for the longer term hospital care necessitated by these services than for the type of hospital care within the relevant product market, and (2) there is no evidence that patients distinguish these types of care when considering whether to travel for hospital care. The main basis for the government's assertion that people inside Dubuque will not travel for hospital care is that they have not done so in the past, they are not willing to go to the extra expense of having to travel and put their families through the expense and inconvenience of having to stay in a hotel to be near them during their hospitalization, and they do not want to switch physicians. Persons traveling for substance abuse treatment and open heart surgery would apparently have these same concerns, yet they are traveling.

Finally, the court turns to the third point—that financial incentives can induce people to travel. Many witnesses testified that employees are more willing to travel now that they are covering a greater portion of their health care costs. Survey results indicate that, for less than $1000.00, Dubuque residents could be induced to travel to another hospital for care. The government disputes the reliability of the surveys, but the survey outcomes are confirmed by the testimony of officers within the managed care

corporations and employers purchasing health care plans.

For example, Doug Sesterhahn testified that SISCO has induced enrollees to travel an hour to an hour-and-a-half for health care by providing financial incentives. Mr. Sesterhahn also testified that he felt SISCO could provide incentives that would induce Dubuque employees to go to Platteville and Southwest Medical Center for care. James Thompson felt that for some categories of patients—nonsurgical, cancer care and heart care patients—a $200 incentive would be enough to induce some Dubuque residents to travel to another regional center for their care. While he was unsure as to the numbers of persons who would travel for a $200 inducement, Mr. Thompson also testified that, with financial inducements of between $500–1000, Heritage could shift patients from inside Dubuque to the regional hospitals for many services in the relevant product market.

The average full charge for inpatient hospitalization at Finley and Mercy is approximately $6,000. Thus, the current 20% discount to managed care payers averages $1,200. If that discount was eliminated at DRHS but available at one of the regional hospitals, the managed care payers would be able to offer a very significant financial incentive in order to get patients to travel. The managed care payers could include a Dubuque hospital in their health care package but also impose different co-pay requirements between the DRHS hospital and regional hospitals so as to induce travel by enough patients to defeat the price increase.

The court must also consider the present trend in hospitalizations toward shorter and fewer hospital stays requiring hospitals to enter into intense competitions for an increased population base. The court finds it relevant that the regional hospitals are in an intense competition to increase the population base from which they draw patients due to the trend in shorter hospital stays and less frequent stays. Mercy has recognized, beginning with its long range plan of 1990, that, to maintain its average daily patient census, it is dependent on increasing its base of patients residing beyond Dubuque County.

DRHS would be under similar pressures. The current state of hospital competition would require that DRHS strongly attempt to expand the use of its hospital by those persons outside Mercy and Finley's traditional catchment areas. If DRHS raised its prices so as to become noncompetitive with other institutions, it would not be able to expand beyond its traditional service area.

The court also notes that 23.7% of Mercy and Finley's patients currently reside in a zip code in which 33% of the residents within that zip code currently use a hospital other than Mercy or Finley. In addition there are an additional 5.9% of Mercy and Finley's patients coming from other zip codes which lie within 15 miles of a regional outreach location. The government makes no attempt to state why these individuals would not be able to switch hospitals in the event of a 15–30% price rise.

### 4. City of Dubuque as the Relevant Market

The government has offered an alternative geographic market. It contends that the City of Dubuque is a geographic market within which DRHS would be able to exercise market power because Dubuque residents will not travel to the rurals or other regional hospitals for hospital care that is available in Dubuque. While this is a much smaller area than DRHS would service, it may be the relevant market if it is a significant market area and DRHS could successfully exert market power over this group. See, Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1434 (9th Cir.1995) (citing Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 518.1b, at 534 (Supp.1993) (geographic market can be shown by showing resulting market power over any group of buyers)). To be the relevant market, there must not be any other supplier of inpatient services who could constrain the price raising capability of DRHS to purchasers of inpatient services who reside within the City of Dubuque. See Phillip E. Areeda & Herbert Hovenkamp ¶ 518.1d, at 538 (Supp.1993).

The validity of a horizontal merger must be determined based on the merg-

er's "effect on competition generally in an economically significant market." *Brown Shoe Co.*, 370 U.S. at 335, 82 S.Ct. at 1529. How large a market must be to be economically significant has never been fully addressed. *See* 2A Phillip E. Areeda & Herbert Hovenkamp ¶ 530e, at 154 (1995). However, the Supreme Court in *Brown Shoe Co.* found that, under some circumstances the relevant geographic area may be as small as a single metropolitan area. *Brown Shoe Co.*, 370 U.S. at 337, 82 S.Ct. at 1530. The court went on to explain:

> The fact that two merging firms have competed directly on the horizontal level in but a fraction of the geographic markets in which either has operated, does not, in itself, place their merger outside the scope of § 7. That section speaks of "any ... section of the country," and if anticompetitive effects of a merger are probable in "any" significant market, the merger—at least to that extent—is proscribed.

*Id.*, at 337, 82 S.Ct. at 1530. The issue is "where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." *Philadelphia National Bank*, 374 U.S. at 357, 83 S.Ct. at 1738. For purposes of this analysis, the court will assume Dubuque is large enough to be an economically significant geographic area for purposes of the antitrust laws.

The government's argument that hospital services are local and that persons residing within Dubuque will not go elsewhere for hospital services is largely based upon the government's perception of inpatients' desires for the convenience of a local hospitalization for themselves and for their family members who will be visiting them. The government analogizes the present case with that of *Philadelphia National Bank*. The government contends that hospital services, like the banking services at issue in *Philadelphia National Bank* are local in nature and that people want the convenience of a local hospital. *Id.* at 358, 83 S.Ct. at 1739 ("The factor of inconvenience localizes banking competition as effectively as high transportation costs in other industries.").

The government next argues that this geographical region is relevant as DRHS could raise prices to all managed care enrollees within the immediate Dubuque area while providing more favorable pricing to those persons that might possibly switch to other hospitals. It is the government's contention that managed care entities cannot get residents of Dubuque to use hospitals outside of Dubuque, and therefore, the merger would substantially lessen competition to those persons residing within the immediate Dubuque area. The government relies heavily on its assertion that residents of Dubuque will not travel for medical care available in Dubuque. However, the court finds, as stated above, that Dubuque residents have in the past traveled for their health care needs and would travel in the future should DRHS prices become noncompetitive.

Much was made of the "Ottumwa Situation"—in that the government argued that the two hospitals in Ottumwa, Iowa were allowed to merge and upon merger, promptly eliminated the discounts to the managed care entities in the area. While the court does not find that there was sufficient evidence presented on the Ottumwa merger to determine how closely the facts behind the Ottumwa merger reflect those of DRHS, the court does note significant differences—the regional hospitals were not targeting areas around Ottumwa for expansion, to this date there has been little outreach activity in the Ottumwa area, and Ottumwa is further from other regional hospitals than is Dubuque.

The court does recognize that other courts have discounted the ability of third party payers to prevent price rises. *See University Health, Inc.*, 938 F.2d at 1213; *Hospital Corp. of America*, 807 F.2d at 1391. These courts found that large insurers who "purchase" hospital services on behalf of their insured merely pass any increased cost on to the consumer. In *University Health Inc.*, the court found that the third party payer could not refuse to reimburse its insured because it deemed the price of the hospital services was too high. *University Health Inc.*, 938 F.2d at 1213. However, these cases did not focus on managed care entities, but focused instead on traditional indemnity insurers. In the case at hand, the defendants have shown that the third party payers of

interest in this matter—the managed care entities—can cause their enrollees to shift to other hospitals if prices at one hospital are too high, thus avoiding having to pay the higher price and providing strong incentive for the anticompetitive hospital to lower its charges.

Further, the competition has become fierce between HMO's. If an HMO were merely to pass on increased hospitalization costs to enrollees, it will lose enrollees to plans that offer a cheaper rate. This pattern has been evidenced in Platteville, Wisconsin, an area where Medical Associates HMO has met strong competition from competing plans.

Even assuming Dubuque residents would not shift in the event of a price increase by DRHS, the government has also failed to establish that DRHS could successfully initiate a price discrimination program. Mr. Thompson testified in general terms that it would be possible for the hospitals to price discriminate on the basis of where a patient resided, but no one established the mechanics of how this would work. Generally, managed care payers contract with the hospitals at one price, but it is conceivable that they could either 1) establish different prices according to which employer the inpatient was insured through, or 2) establish different prices according to where the inpatient resided. If the hospital were to price discriminate by employer, this would presumably lead to the same rate being offered to all Dubuque employees without regard to where they reside. However, a substantial number of persons employed in Dubuque reside significant distances from Dubuque and would presumably have greater access to alternative hospital care. These employees would shift from using a managed care plan that used DRHS to a plan using other hospitals. The government did not address how many employees reside outside of Dubuque and therefore would shift to managed care entities with presumably lower premiums. Without any quantification, it is only speculation on the government's part that such a program would be feasible.

Should DRHS attempt the other option, charging different rates based on where the employee resides, this would appear to require complex accounting by both the managed care entity and the hospital. The government has not attempted to prove that employers would agree to offer the same plan to its employees at different rates depending on where the employee resides nor has it proven that the managed care payers would agree to offer such plans. Again, that such a plan is feasible is mere speculation on behalf of the government.

Further, looking specifically at those managed care entities that currently receive discounts off their hospitalizations from Mercy or Finley, there is little evidence to support the government's contention that discounts to these businesses could profitably be eliminated if the hospitals merge. Mercy gives discounts to Medical Associates, Heritage National Health Plan, SISCO, Blue Cross Alliance, HMO of Wisconsin, Wisconsin Education Association Insurance and the Affordable Health Plan.

Presumably discounts to the two Wisconsin companies would have to be maintained as there is substantial competition for the residents of southwest Wisconsin. Also, the discount to Blue Cross Alliance could not be eliminated as it offers a contract with hospitals on a "take it or leave it" basis and DRHS would either have to accept its terms or deny admittance to Blue Cross Alliance enrollees. That leaves Self Insured Systems Corporation (SISCO), Heritage National Health Plan and Medical Associates. As discussed above, Heritage has shown it has the general ability to transfer patients out of the Dubuque area to another regional hospital so it could prevent DRHS from denying it a discount. It is uncertain where SISCO's enrollees come from, but assuming they do all come from the immediate Dubuque area, it is not apparent that they could not transfer patients as does Heritage. The government has asserted no reason why SISCO would be less effective at altering hospitalization patterns than is Heritage. If SISCO did not have the patient volume to enable it to adequately threaten DRHS into maintaining discounts, presumably another managed care entity with the volume to obtain discounts could win some of SISCO's accounts and the end user of the

hospital services—the enrollee would still have competitive options for hospitalization.

■ The government argues that Medical Associates would not shift patients to other hospitals because it is physician owned and prefers to use only the physician services of its Dubuque physicians. Shifting patients to other hospitals would require it to also pay outside physicians for services provided to their enrollees while hospitalized at a non-Dubuque hospital. However, the antitrust laws protect competition, not competitors. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). If DRHS were to refuse to give Medical Associates a discount, but did give discounts to other managed care entities who would shift patients, Medical Associates would soon lose many of its enrollees as it would no longer be price competitive.

However, the more likely scenario would be that DRHS would continue to give discounts to Medical Associates as it would be very dependent on Medical Associates to perform outpatient services at DRHS and to attract inpatients through its outreach efforts. In 1991, Mercy recognized that because of fewer and shorter hospitalizations, its patient volume was decreasing and it needed to increase its market share of the population base outside of Dubuque County. Mercy has focused on its relationship with Medical Associates as the major method of attracting new populations. As a would-be large purchaser of DRHS's services, Medical Associates could also bargain for discounts from DRHS through threats to discontinue use of DRHS outpatient services. Currently ⅛ of Medical Associates payments to both Mercy and Finley are for outpatient services, many of which Medical Associates could potentially perform at its own facilities if DRHS prices discriminated against it.

### D. Distinction from Rockford

The plaintiff relies heavily on *United States v. Rockford Mem. Corp.,* 898 F.2d 1278 (7th Cir.1990), to argue that it is ridiculous to conceive of a relevant geographic market area encompassing more than a few counties. The *Rockford Mem. Corp.* court stated that:

But for the most part, hospital services are local. People want to be hospitalized near their families and homes, in hospitals in which their own—local—doctors have hospital privileges.... [The defendants'] proposal is ridiculous—a ten-county area in which it is assumed (without any evidence and contrary to common sense) that Rockford residents, or third party payors, will be searching out small, obscure hospitals in remote rural areas if the prices charged by the hospitals in Rockford rise above competitive levels.

*Id.* at 1285. The evidence in this case shows, however, that the *Rockford Mem. Corp.* assumptions are not correct. There is strong evidence of (1) individuals' willingness to travel, given price incentives, (2) patient-doctor loyalty is not strong enough to overcome price differentials, and (3) there are options other than the rural hospitals should DRHS raise prices. A further distinction is that the *Rockford Mem. Corp.* case did not discuss how outreach clinics can impact on hospital accessibility and choice.

The court also wishes to note that other hospital merger cases have not considered the impact of outreach clinics in their discussions of barriers to entry into the relevant geographic market. Most hospital cases have stated the inability to build new hospitals as a strong barrier to entry. *See University Health, Inc.,* 938 F.2d at 1211. The parties to this dispute have stipulated that no new hospital would be built in the tri-state area within the relevant time frame. However, entry would not necessitate the building of a new hospital, but merely requires that another entity be able to enter a market it was not previously servicing. The regional hospitals are able to do this through the establishment of outreach clinics.

### E. Probability of a Reduction in Quality of Care

■ The government also attempts to argue that DRHS will be able to lessen the quality of the health care provided due to the market power it will obtain through the merger.

The government contends that by no longer remodeling its facilities and providing "free" infant car seats, this would be a price increase to inpatients. However, the free give away of car seats and the condition of the hospital room itself is unrelated to the hospital's decision to give a discount, and does not appear to have any relation to where a managed care entity sends its patients. The "amenities" competition has gone on for some period of time prior to the advent of price competition between hospitals and the court finds that it is mainly used for public relations purposes and possibly to attract persons covered by indemnity insurance, Medicare, and Medicaid, who are not price conscious. The government has not shown that these amenities improve the quality of health care received and it can certainly be argued that they unnecessarily add to health care costs. Further, even if not giving away car seats or failing to remodel can be considered a price increase, the government has not shown these to be significant price increases for purposes of antitrust analysis.

## F. Conclusion

The government has failed to establish the relevant geographical area and hence has failed to establish that the merger of Mercy and Finley Hospitals will likely result in anticompetitive effects.

### III. *Defendants' Affirmative Defenses*

Since the government has failed to carry its burden in this case, the defendants are not required to prove their affirmative defenses. However, in order that the record is complete in this matter, the court will address the two affirmative defenses which remain in this case. Based upon the defendants' post-trial submissions, the defendants are still asserting two affirmative defenses: (1) that the efficiencies which result from the merger will outweigh any anticompetitive effects which may result from the merger; and (2) the hospitals' nonprofit status will prevent anticompetitive behavior. For the reasons stated below, the court finds that the defen-

dants have failed to meet their burden as to each of these defenses.

## A. Efficiencies Defense

The courts have recognized that in an appropriate case, "... a defendant may rebut the government's prima facie case with evidence showing that the intended merger would create significant efficiencies in the relevant market." *University Health, Inc.,* 938 F.2d at 1222. The parties dispute the proper standard of proof which is required to establish an efficiencies defense. The government argues that the defendants are required to establish such a defense by clear and convincing evidence. The defendants counter by arguing that case law only requires the normal preponderance of the evidence standard to apply. The court concludes, however, that for purposes of this case, the defendants have failed to meet even the lower burden of showing an efficiencies defense by a preponderance of the evidence.

The irony of this case is, that while the government has failed to meet its burden of showing that the merger will result in anticompetitive behavior in the relevant market, the court must conclude that the defendants have fallen far short in several respects in proving the efficiencies which it claims will result from the creation of DRHS. The defendants have failed to meet this burden in several significant respects: (1) a merger is not required to achieve many of the efficiencies;[4] (2) implementation of the steps necessary to achieve the efficiencies is highly speculative; and (3) the Gallagher Report overstates the efficiencies which can be achieved.

Each side presented an efficiencies expert who prepared various reports and testified at trial. The defendants presented Duncan Gallagher, a senior manager at Peat Marwick & Co., as their expert. The government countered with a report and testimony of Dr. Robert Taylor. On balance, the testimony and report of Dr. Taylor is far more persuasive and credible.

4. It is generally accepted that if the efficiencies may be obtained through a method which would not limit competition, then they may not be used as a valid defense. *See University Health Inc.,* 938 F.2d at 1222 n. 30.

Mr. Gallagher estimates that the total operating efficiencies that can be achieved as a result of the merger are approximately $5.2 million per year. However, approximately $2.1 million of that figure represents savings from "best practices." Best practices is somewhat of an illusive concept. Generally it can be defined as an attempt by hospitals to become more efficient in utilization of resources and the avoidance of duplication of expenses. Best practices can be contrasted from general attempts at efficiencies by its focus on physician practices. The defendants argue that as a merged entity they can review items such as the number of x-rays a particular physician may order and compare that number to practices of other physicians in order to determine the number of tests which are most efficient while still maintaining patient care. This efficiency becomes the "best practice."

Based upon the evidence and testimony, including Dr. Taylor's analysis, it is apparent there are a number of flaws with the best practices analysis used by Mr. Gallagher. First, Mr. Gallagher concedes that this is the first time he has ever used best practices as a part of an efficiencies analysis in a hospital merger case. This points out one of the fundamental flaws with the analysis, that is, that there is little evidence a merger is necessary in order to implement the best practices savings the hospitals hope to achieve. Even one of the defendants' own witnesses, Gary Gutzko, testified that best practices does not require a merger. The hospitals argue that they need to merge in order to create a database for every department in the hospital. Dr. Taylor points out, however, there are a multitude of alternative databases available which can be used to compare the practices at Mercy and Finley in order to achieve optimum efficiencies.

There is also a serious question about the methodology used in determining the savings from best practices. Mr. Gallagher stated that the numbers he came up with for the best practices were essentially those given to him by Terry Steele.

In summary, I find the testimony of Dr. Taylor is more credible on the issue of the efficiencies which can be achieved from the merger. Dr. Taylor's report shows that the optimum efficiencies which can be achieved from the merger total approximately $2 million per year for both operating and capital expenses.

The defendants argue that even if the $2 million figure of Dr. Taylor's is used, that the efficiencies outweigh any alleged anticompetitive effects from the formation of DRHS. However, the hospital's proof of its abilities to implement the efficiencies is also lacking. The government argues that the whole efficiencies issue is speculative because the DRHS Board has made no decision as to which actions will be taken in order to implement any of the changes which will result in the efficiencies. The government's argument is not well founded in this regard. The DRHS Board cannot come into existence until the merger is approved and becomes effective. Consequently, the DRHS Board can make no decisions at this time as to how it is going to operate the merged entity. The testimony shows that the proposed members of the DRHS Board are serious about obtaining optimum efficiencies from the merger and will do everything within their power to achieve all the potential efficiencies that may result from the merger.

The more serious problem, which was not adequately addressed by the hospitals, is the ability of the DRHS Board to impose on the physicians and other parties the type of changes that will be required in order to achieve the efficiencies outlined in either the Gallagher or Taylor reports. As an example, both reports envision efficiencies being achieved by merging all of the obstetrical services at Finley Hospital. It is highly questionable as to whether the DRHS Board can impose such a change on the medical community given the strong opposition of Medical Associates to the merger, and the unwillingness of Medical Associates physicians to use Finley for obstetrical services when Finley offered the Medical Associates HMO a substantial discount if more Medical Associates' patients were directed to Finley. Given the fact that Medical Associates physicians were not willing to use Finley Hospital when they had a strong personal financial incentive to do so, leads to the conclusion

that there very likely will be significant opposition to eliminating the obstetrics unit at Mercy Hospital.

In summary, if the government had been successful in showing anticompetitive effects from the merger, the hospital efficiencies defense must fail. The evidence is inadequate to warrant a finding of maximum potential efficiencies in any amount in excess of the $2 million found by Dr. Taylor in his report. Moreover, there is a lack of evidence on behalf of the hospitals as to their actual ability to implement proposed efficiencies.

## B. Non–Profit Status

The hospitals have also asserted as a defense their non-profit status and procompetitive intent. The hospitals cite *United States v. Carilion Health Sys.*, 707 F.Supp. 840, 849 (W.D.Va.), *aff'd without op.*, 892 F.2d 1042 (4th Cir.1989), for the proposition that the non-profit status of the hospitals can be considered in determining whether the hospitals would act in an anticompetitive manner. The government points out, this is a questionable legal proposition. No other courts have explicitly adopted this theory of defense. Moreover, the facts in this case would not support the defense even if it were legally viable.

The government has presented substantial evidence to demonstrate that Mercy Hospital, in particular, has operated in a fashion similar to a for-profit corporation. Mercy Health Center of Dubuque is an operating division of Mercy Health Services of Detroit, Michigan. The evidence shows that in recent years Mercy Hospital of Dubuque has been required to return approximately 30% of its profits to the parent corporation. This figure has totaled approximately $1.5 million to $2 million per year over the past several years. Obviously, the operations of the parent corporation cannot be funded out of a percentage of the profits if there are no profits generated by the Dubuque subsidiary. This is not a criticism of the payment of money to the Detroit parent. There are legitimate business and charitable reasons for the payments to the parent corporation. However, the fact remains that the practical effect of the funds transfer is to operate the hospital as the functional equivalent of a profit making subsidiary of an out-of-state corporation.

The court does not mean to imply by this decision that there is any evidence of an intent to act in an anticompetitive manner by any of the parties to the proposed merger. To the contrary, the testimony of proposed Board members such as Don Moody, is extremely credible. Individuals such as Mr. Moody and other proposed members of the DRHS Board have only the highest motives in proposing this merger. It is clearly their intent to provide high quality and efficient health care to the Dubuque community. However, the fact remains, that for antitrust analysis, the court must assume that new and different Board members can take control of the corporation, and that if there is the potential for anticompetitive behavior, there is nothing inherent in the structure of the corporate board or the non-profit status of the hospitals which would operate to stop any anticompetitive behavior.

## ORDER

Accordingly,

**It Is Ordered:**

Plaintiff's request for an injunction to block the merger of Mercy Health Center and Finley Hospital is denied. Judgment shall enter for the defendants.

Done and ordered.

## APPENDIX

In addition to the findings of facts within the body of the opinion are these additional facts which the parties stipulated were correct.

1. Mercy and Finley, located six blocks apart, are the only general acute care hospitals in Dubuque and are the largest general acute care hospitals within a 70–mile drive of Dubuque.

2. Mercy has 302 licensed acute care (excluding skilled nursing, rehabilitation, intermediate, psychiatric and substance abuse) beds excluding Dyersville, and in 1993 it had net inpatient revenues of approximately $44 million.

3. Finley has 141 licensed acute care beds (excluding skilled nursing care beds) and, for its 1993 fiscal year, had net inpatient revenues of approximately $21 million.

4. Mercy and Finley are each financially sound and viable institutions; they have fund balances in excess of $45 million and $30 million, respectively.

5. In April, 1994, the president of Mercy agreed that Mercy is financially healthy.

6. The assessment of the president of Mercy in April, 1994, that Mercy is financially healthy is true.

7. In April, 1994, the vice-president of finance of Mercy agreed that Mercy is in good, reasonable financial shape, and there are no key indicators of performance in Mercy's 1994 to 1996 Budget Report that he has any particular concern about.

8. The assessment of the vice-president of finance of Mercy in April, 1994, that Mercy is in good, reasonable financial shape is true.

9. In April, 1994 the president and chief executive officer of Finley stated that Finley has a Standard and Poors Rating of A—, which he agreed meant that Standard and Poors assesses Finley's financial condition to be strong.

10. Health Care Investment Analysts, Inc. and Mercer Management Consulting, Inc. issued a report in 1994 citing Finley as one of the 25 most efficient hospitals in the United States with fewer than 250 beds.

11. The proposed Mercy/Finley combination is not required to maintain the financial soundness or viability of either hospital.

12. The staff list provided to the Department of Justice by Mercy indicated that there were 173 physicians on the active medical staff. On December 31, 1993, Mercy had 168 physicians, including at least 15 surgeons, on its active medical staff.

13. The staff list provided to the Department of Justice by Finley indicated that there were 137 physicians on either its active or provisional medical staff (20 of these physicians had provisional privileges). On December 31, 1993, Finley had 144 physicians, including at least 11 surgeons, on its active medical staff.

14. In its 1993 fiscal year, Mercy had approximately 8,000 acute-care patient discharges (i.e., all discharges except for skilled nursing, intermediate care, rehabilitation, psychiatric and substance abuse discharges), and its average daily census of such acute-care patients was approximately 110.

15. In its 1993 fiscal year, Finley had approximately 4,500 acute-care patient discharges (i.e., all discharges except for skilled nursing discharges), and its average daily census of such acute-care patients was approximately 67.

16. The Department of Justice filed a verified complaint on June 10, 1994 seeking to prevent the merger of Mercy and Finley and to have the transaction adjudged to be a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

17. In providing inpatient hospital services, both Mercy and Finley regularly receive substantial health care insurance reimbursement payments and shipments of equipment and supplies from outside of Iowa. For example, in 1993 Mercy paid more than $6 million to vendors located outside Iowa for supplies or services used by Mercy, and Finley paid more than $5 million to vendors located outside Iowa.

18. Mercy and Finley are each engaged in interstate commerce.

19. Mercy and Finley are each engaged in activities substantially affecting interstate commerce.

20. The United States has met its burden of proof on the issue of "effect on interstate commerce."

21. The Court has jurisdiction over the subject matter of this lawsuit under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

22. Mercy and Finley are subject to the personal jurisdiction of this Court.

23. Mercy and Finley each provide high quality general inpatient acute care services to consumer-patients and having reputations

among local physicians and the public for doing so.

24. Mercy and Finley each will be able to provide consumer-patients with high quality general inpatient acute care services even if the proposed combination does not take place.

25. Third-party payers of acute care inpatient services provided by Mercy and Finley include traditional indemnity health care insurers, managed care plans, the federal Medicare program and the Medicaid programs of the states of Iowa, Illinois and Wisconsin.

26. In April, 1994, the vice-president of finances of Mercy, who is that hospital's primary officer with responsibility for contracting with managed care companies, agreed that one of the effects of managed care payers not paying Mercy's full charges is to put incentives on Mercy to be more cost effective.

27. In a Preliminary Official Statement, dated November 23, 1993, relating to a new bond issue, Finley represented to the public that of the eight metropolitan areas in Iowa, only one area had a lower rate of adjusted expense per hospital admission than Dubuque and of the 31 metropolitan areas in the States of Iowa, Kansas, Minnesota, Missouri, Nebraska, North Dakota and South Dakota, only 3 areas had a lower rate of adjusted expense per hospital admission, according to the American Hospital Association.

28. Finley's management made the above-summarized representation concerning how the adjusted expenses per hospital admission in Dubuque compares to other metropolitan areas in Iowa and elsewhere to demonstrate how effective Finley is at controlling hospital costs, and Finley's management had a good faith basis for believing these representations to be true.

29. The creation of DRHS will end the competition between Mercy and Finley on price, quality and otherwise.

30. Outpatient care usually is less expensive than inpatient care.

31. In April 1994, the president and chief executive officer of Finley agreed that outpatient care is generally less costly than inpatient care.

32. The assessment of the president and chief executive officer of Finley, in April, 1994, that outpatient is generally less costly than inpatient care is true.

33. During the past decade, there have been major advances in medical technology including diagnostic and therapeutic equipment, medications, anesthetics, surgical techniques, monitoring systems, and other medical equipment. These advances have made it possible for services that once were appropriately and safely performed only on an inpatient basis to be performed on an outpatient basis—in outpatient clinics, surgery centers and doctors' offices.

34. There are certain medical procedures for which many third-party payers that do business with Mercy and Finley will reimburse hospitals only if the particular procedure is performed on an outpatient basis, unless some specific medical condition requires inpatient admission.

35. In conjunction with developing criteria for mandatory outpatient procedures, many third-party payers may also require "pre-admission certification" of inpatient admissions, which is a procedure designed to confirm the appropriateness of inpatient care for the treatment of the patient's diagnosis. After evaluating the patient, the third-part payer may conclude that a course of outpatient treatment is appropriate, rather than the generally more costly inpatient treatment. In such an instance, the third-party payer may refuse to reimburse hospitals for any charges rendered in connection with uncertified patients.

36. Third-party payers that do business with Mercy and Finley often conduct concurrent and post-discharge utilization review. Concurrent review is the process by which current inpatients are evaluated by health professionals retained by third-party payers to determine when the patient should be discharged and treated as an outpatient. Post-discharge utilization review is a process used by many third-party payers to evaluate

retrospectively the propriety of admission and decide whether or to what extent to reimburse hospitals.

37. Presently and in the foreseeable future, there are limitations from a medical perspective, upon the types of patients and the types of illnesses and medical conditions that can be treated appropriately through outpatient services. There are patients who require services and monitoring that are too intensive to be done on an outpatient basis; in addition, for certain types of procedures especially surgical ones, some inpatient hospital care is necessary after the procedure is performed, so that they cannot be performed appropriately on an outpatient basis.

38. If a patient's admission to a hospital is not medically justified then, pursuant to implementation of utilization review procedures, third-party payers may refuse to pay for the patient's use of such services.

39. Many patients who receive inpatient hospital care cannot be treated safely and effectively on an outpatient basis.

40. In part, as a result of the utilization review procedures of third-party payers for patients who are hospitalized today at Mercy and Finley, outpatient services are not a good substitute for the hospital services that are provided only by acute-care hospitals on an inpatient basis.

41. It is unlikely that any new general acute care hospital will be established in the Dubuque area in the foreseeable future.

42. Iowa's CON statute likely would prevent any new general acute care hospital from being established in Dubuque in the foreseeable future.

43. It is unlikely that any new general acute care hospital will be established in the foreseeable future in Illinois within twenty miles of Dubuque, Iowa.

44. It is unlikely that any new general acute care hospital will be established in the foreseeable future in Wisconsin within twenty miles of Dubuque, Iowa.

45. The creation of DRHS does not fit within the "safety zones" as set forth in the *Statements of Antitrust Enforcement Policy in the Health Care Area* issued September 15, 1993 by the Department of Justice and the Federal Trade Commission.

46. Mercy and Finley do not contend that the proposed combination is justified by virtue of "the failing company defense."

47. Each of Mercy and Finley has a 24 hour emergency room and trauma center, 24 hour operating rooms, a mobile MRI, a CT scanner and an occupational health program.

48. The hospitals have stated in both their "Vision Statement" and Partnership Agreement that the purpose in forming DRHS is to:

a. provide joint governance and management of the Hospitals in order to reduce duplicative services and expenditures, strengthen the Hospitals' ability to contract for managed care and enhance the quality of care provided by the Hospitals;

b. enable the Hospitals to reduce their respective overall costs, to more effectively and economically provide efficient and integrated quality hospital services, and to perform the purposes for which each was formed and operated;

c. enable the Hospitals to compete more effectively, better serve the citizens of Iowa, Illinois, Minnesota and Wisconsin, and offer a broader range of services and programs;

d. provide needed health care services, own and operate facilities to provide such services, and take such actions as are necessary or appropriate in connection with providing such services and owning and operating such facilities.

49. Medical Associates Clinic, P.C. is a competitor of Mercy and Finley for some but not all out-patient services, and would be a competitor of DRHS for some but not all outpatient services if DRHS was formed.

50. A competitor (meaning a competitor for the services of the hospital whose prices are posited to be higher or lower) of Mercy and Finley could, other things being equal, benefit from the hospitals' charging higher

prices and could, other things equal, be harmed by the hospitals' charging lower prices, since such a competitor can take advantage of higher prices and gain more business at the expense of the hospitals and could lose business if the hospitals' prices are lower.

51. A competitor (meaning a competitor for the services of the hospital whose quality are posited to be higher or lower) of Mercy and Finley could, other things being equal, benefit from the hospitals' providing services of lower quality and could, other things equal, be harmed by the hospitals providing services of higher quality, since such a competitor can take advantage of lower quality and gain more business at the expense of the hospitals, and could lose business to the hospitals if they provided higher quality.

52. Managed care plans, such as HMOs, may derive competitive advantages over other payers as a result of receiving discounts from hospitals relative to the hospitals' charges. An HMO or other managed care plan may be better off competitively if it receives a discount from hospital charges than if it receives no discount, but pays lesser reimbursement. This is because HMOs and managed care plans may receive competitive advantages from paying rates of reimbursement to hospitals which are lower than those paid by competing payers and by employers.

53. Allen Memorial Hospital in Waterloo, Iowa, has approximately 194 staffed acute care beds with a 1993 average daily census of approximately 145. Allen Memorial Hospital is approximately a 41–mile drive from the edge of Mercy's and Finley's service areas.

54. Covenant Medical Center in Waterloo, Iowa, has approximately 322 staffed acute care beds with a 1993 average daily census of 173. Covenant Medical Center is approximately a 410–mile drive from the edge of Mercy's and Finley's service areas.

55. St. Luke's Methodist Hospital in Cedar Rapids, Iowa, has approximately 441 staffed acute care beds with a 1993 average daily census of 28. St. Luke's Methodist Hospital is approximately a 37–mile drive

from the edge of Mercy's service area and approximately an 18–mile drive from the edge of Finley's service area.

56. Mercy Medical Center in Cedar Rapids, Iowa, has approximately 353 staffed acute care beds with a 1993 average daily census of 193. Mercy Medical Center is approximately a 37–mile drive from the edge of Mercy's service area and approximately an 18–mile drive from the edge of Finley's service area.

57. St. Mary's Hospital Medical Center in Madison, Wisconsin, has approximately 345 staffed acute care beds with a 1993 average daily census of 265. St. Mary's Hospital Medical Center is approximately a 55–mile drive from the edge of Mercy's service area and approximately a 41–mile drive from the edge of Finley's service area.

58. Freeport Memorial Hospital in Freeport, Illinois, has approximately 143 staffed acute care beds with an average daily census of 70. Freeport Memorial Hospital is approximately a 28–mile drive from the edge of Mercy's service area and approximately an 18–mile drive from the edge of Finley's area.

59. University of Wisconsin Hospital and Clinics in Madison, Wisconsin, has approximately 496 staffed acute care beds with a 1993 average daily census of 386. University of Wisconsin Hospital and Clinics is approximately a 55–mile drive from the edge of Mercy's service area and approximately a 41–mile drive from the edge of Finley's service area.

60. Meriter Hospital in Madison, Wisconsin, has approximately 429 staffed acute care beds with a 1993 average daily census of 258. Meriter Hospital is approximately a 55–mile drive from the edge of Mercy's service area and approximately a 41–mile drive from the edge of Finley's service area.

61. University of Iowa Hospitals and Clinics in Iowa City, Iowa, has approximately 868 staffed acute care beds with a 1993 average daily census of 677. University of Iowa Hospitals and Clinics is approximately a 63–mile drive from the edge of Mercy's and Finley's service areas.

62. Mercy's service area extends approximately 40 miles from Mercy.

63. Finley's service area extends approximately 40 miles from Finley.

64. Galena–Stauss Hospital is within Mercy's and Finley's service areas.

65. Jackson County Public Hospital is within Mercy's and Finley's service areas.

66. Delaware County Memorial Hospital is within Mercy's and Finley's service areas.

67. Central Community Hospital is within Finley's service area.

68. Guttenberg Municipal Hospital is within Mercy's and Finley's service areas.

69. Lancaster Memorial Hospital is within Mercy's and Finley's service areas.

70. Southwest Health Center is within Mercy's and Finley's service areas.

71. The city of Bellevue is approximately a 23–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Bellevue is approximately a 20–mile drive from Jackson County Public Hospital.

72. The city of Holy Cross is approximately a 25–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Holy Cross is approximately a 27–mile drive from Southwest Health Center.

73. The city of Hazel Green is approximately a 13–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Hazel Green is approximately a 15–mile drive from Southwest Health Center.

74. The city of Farley is approximately a 20–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Farley is approximately a 26–mile drive from Delaware County Memorial Hospital.

75. The city of Cascade is approximately a 25–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Cascade is approximately a 36–mile drive from Delaware County Hospital.

76. The city of Dickeyville is approximately an 11–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Dickeyville is approximately an 11–mile drive from Southwest Health Center.

77. The city of Monticello is approximately a 34–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Monticello is approximately a 34–mile drive to St. Luke's Methodist Hospital in Cedar Rapids, Iowa.

78. The city of Dyersville is approximately a 26–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Dyersville is approximately a 19–mile drive from Delaware County Memorial Hospital.

79. The city of Cuba City is approximately a 19–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Cuba City is approximately a 10–mile drive from Southwest Health Center.

80. The city of Epworth is approximately a 16–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Epworth is approximately a 30–mile drive from Delaware County Memorial Hospital.

81. The city of Potosi is approximately a 20–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Potosi is approximately a 12–mile drive from Lancaster Memorial Hospital.

82. The city of Elizabeth is approximately a 30–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Elizabeth is approximately a 13–mile drive from Galena–Strauss Hospital.

83. The city of Zwingle is approximately a 15–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Zwingle is approximately a 16–mile drive from Jackson County Public Hospital.

84. The city of Worthington is approximately a 31–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Worthington is approximately a 25–mile drive to Delaware County Memorial Hospital.

85. The city of North Buena Vista is approximately a 21–mile drive from Dubuque, and is within Mercy's and Finley's service areas. North Buena Vista is approximately a 13–mile drive from Guttenberg Municipal Hospital.

86. The city of LaMotte is approximately a 19–mile drive from Dubuque, and is within

Mercy's and Finley's service areas. LaMotte is approximately a 20–mile drive from Jackson County Public Hospital.

87. The city of Shullsburg is approximately a 28–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Shullsburg is approximately a 19–mile drive from Galena–Stauss Hospital and a 24–mile drive from Southwest Health Center.

88. The city of Delmar is approximately a 37–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Delmar is approximately a 37–mile drive from Genesis Medical Center in Davenport, Iowa.

89. The city of Sabula is approximately a 45–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Sabula is approximately a 51–mile drive from Genesis Medical Center in Davenport, Iowa.

90. The city of Wyoming.is approximately a 42–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Wyoming is approximately a 38–mile drive from St. Luke's Methodist Hospital and Mercy Medical Center in Cedar Rapids, Iowa.

91. The city of Monmouth is approximately a 42–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Monmouth is approximately a 44–mile drive to St. Luke's Methodist Hospital in Cedar Rapids, Iowa.

92. The city of Baldwin is approximately a 41–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Baldwin is approximately a 45–mile drive from St. Luke's Methodist Hospital in Cedar Rapids, Iowa.

93. The city of Nashville is approximately a 36–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Nashville is approximately a 50–mile drive from St. Luke's Methodist Hospital and Mercy Medical Center in Cedar Rapids, Iowa.

94. The city of Charlotte is approximately a 45–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Charlotte is approximately a 33–mile drive from Genesis Medical Center in Davenport, Iowa.

95. The city of Spragueville is approximately a 45–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Spragueville is approximately a 55–mile drive from Genesis Medical Center in Davenport, Iowa.

96. The city of Lost Nation is approximately a 46–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Lost Nation is approximately a 45–mile drive from Genesis Medical Center in Davenport, Iowa, and approximately a 55–mile drive from St. Luke's Methodist Hospital in Cedar Rapids, Iowa.

97. The city of Miles is approximately a 54–mile drive from Dubuque, and is within Mercy's and Finley's service areas. Miles is approximately a 60–mile drive from Genesis Medical Center in Davenport, Iowa.

98. The Statement of Department of Justice and Federal Trade Commission Enforcement Policy on Mergers Among Hospitals states that the Department of Justice and Federal Trade Commission "often have concluded that an investigated hospital merger will not result in a substantial lessening of competition in situations where market concentration might otherwise raise an inference of anticompetitive effects" and that "[s]uch situations include transactions where the Agencies found that:

> ... [T]he merger would allow the hospitals to realize significant cost savings that could not otherwise be realized ..."

99. Hospital mergers have occurred in Iowa in the last 2 years in Mason City (where one independent acute care hospital remains), and in Davenport (where two independent acute care hospitals remain). Neither of these transactions was challenged by the Government.

100. At least 40 physicians with offices in Dubuque provide out-patient clinics on at least a monthly basis at distances from 15 to more than 40 miles from Dubuque. At least 9 of these physicians traveled at least 40 miles to do so. At least 17 of these physicians traveled at least 30 miles to do so.

101. Genesis Medical Center in Davenport, Iowa, has approximately 462 staffed acute care beds. Genesis Medical Center is

approximately a 35–mile drive from the edge of Mercy's and Finley's service areas.

102. Managed care plan payments as a percentage of Mercy's revenues, including inpatient care revenues, are expected to continue increasing in the future.

103. Managed care plan payments as a percentage of Finley's revenues, including inpatient care revenues, are expected to continue increasing in the future.

104. The percentage of patients admitted to Mercy for inpatient care who are covered by a managed care plan is expected to continue increasing in the future.

105. The percentage of patients admitted to Finley for inpatient care who are covered by a managed care plan is expected to continue increasing in the future.

106. No final decision has been made as to which, if any, clinical programs at Mercy or Finley will be consolidated after the proposed combination occurs.

107. No final decision has been made as to whether the following program at Finley or Mercy will be consolidated after the proposed combination occurs:

   a. Cardiovascular

   b. Oncology

   c. Women's & Child Health

   d. Emergency/Trauma

   e. Obstetrics

   f. Orthopedics/Neurology

   g. Surgery

   h. Anesthesiology

   i. Administration

   j. Human Resources

   k. Public Relations/Marketing

   l. Maintenance/Bio–Med

   m. Billing

   n. Magnetic Resonance Imaging Program

108. Defendants have no present plans to make DRHS into a tertiary care hospital.

109. Mercy's Board of Directors has not changed a price recommendation of Mercy's finance committee in the past three years.

110. Finley has made efforts in the last three years to attract patients away from Mercy.

111. There are no present plans for the proposed combination to add additional services or upgrade any particular services.

112. No proof has been submitted to Finley's Board that community-based boards of directors control hospital costs better than other types of boards.

113. Finley does better than many hospitals in controlling its costs.

114. In 1990, Mercy, through KCA Research, conducted a community telephone survey ("the survey") to assess Mercy's role in the community to help lay the foundation for future strategic planning.

115. The largest percentage of the survey's respondents said: (i) Mercy or Finley was the first hospital that came to mind when the word "hospital" was mentioned; and (ii) overall they prefer to go to Mercy or Finley in Dubuque for their health care needs.

116. 40.7% of the survey's respondents lived in Dubuque, Iowa, zip code 52001. 59.3% of the survey's respondents lived outside of Dubuque, in 51 other zip codes from Dubuque County and Jackson County, Iowa, Grant County, Wisconsin, and Jo Davies County, Illinois.

117. More than three-quarters of the survey's respondents said the hospitals' being near their home was either very important or somewhat important to them when choosing a hospital.

118. Almost 97 of the survey's respondents said a wide variety of specialists is important to them when choosing a hospital.

119. Mercy and Finley receive a bulk of their revenues from providing general acute care inpatient hospital services, i.e., services provided for the diagnosis and treatment of patients who, because of the seriousness of their specific illness or general medical condition, require at least an overnight hospital stay. In Fiscal Year 1993, Mercy had total gross patient revenue of approximately $100 million, of which approximately $60 million was derived from inpatient acute care ser-

vices (which excludes revenue from emergency room care, intermediate care, newborn nursery, outpatient services, psychiatric care, rehabilitation, substance abuse, and skilled nursing care). In Fiscal Year 1993, Finley had total gross patient revenue of approximately $57 million of which approximately $32 million was derived from inpatient acute care services (which excludes revenue from emergency room services, outpatient care, and skilled nursing).

120. Several of the managed care plans that contract with Mercy and Finley have non-exclusive relationships with both hospitals, i.e., they negotiate contracts with both hospitals. Two other managed care plans have exclusive contracts with Mercy.

121. Mercy and Finley cooperated in containing health care costs through the formation of United Clinical laboratories in the mid–1990s, as a joint venture for providing laboratory services for Mercy and Finley.

122. The seven small rural hospitals primarily serve patients within their immediate locales, where the phrase "immediate locales" means "closer to the rural hospital than to any other hospital."

123. Mercy and Finley are closer for those persons that both live and work within Dubuque than hospitals outside of Dubuque; however, the convenience of a particular hospital depends upon a variety of factors, including, but not limited to, the hospital's location, the location of resident's physician's practice, the accessibility of the hospital, and the location of the resident's employment.

124. Finley has advertised to attract patients away from Mercy.

125. One of the reasons Mercy gives manage care plans discounts is to attract a greater volume of patients.

126. Mercy stated in its 1991–94 Strategic Plan that Mercy and Finley are in direct competition for Dubuque County inpatients. The 1991–94 Strategic Plan also states that in 1988 only 6.5% of discharges for patients residing in Dubuque County were at hospitals other than Mercy or Finley.

127. Mercy's vice-president of finance has stated that it is speculation to make hospital budget projections beyond three years.

128. Mercy's vice-president of finance has stated that it is speculation to make projections about efficiencies from the proposed consolidation beyond a three-year period.

129. Mercy's vice-president of finance has stated that managed care plans use financial incentives to pressure hospitals to be as efficient as possible.

130. Central Community Hospital in Elkader, Iowa has 29 licensed beds and is located within Finley's service area. In 1993, the hospital's average daily census was three to four acute-care and nursery patients. There are four physicians on the active medical staff, including one general surgeon. In 1993, Central Community Hospital had gross inpatient revenues of approximately $1.3 million and recently undertook a $1.4 million expansion of its facilities. Central Community Hospital is at least a 60 minute drive from Dubuque but the drive time could be longer, depending on traffic, road and weather conditions. Physicians from the Dubuque area conduct specialty outreach clinics in Elkader.

131. Delaware County Memorial Hospital in Manchester, Iowa, has 58 licensed beds and is located within Mercy's and Finley's service area. The hospital has recently undergone renovations and added new birthing facilities. In 1993, the hospital's average daily census was 12 acute-care patients. There are 10 physicians on the active medical staff, including one general surgeon. In its fiscal year 1993, Delaware County Memorial Hospital had gross inpatient revenues of approximately $4.5 million. Delaware County Memorial Hospital is at least a 40 minute drive from Dubuque but the drive time could be longer, depending on traffic, road and weather conditions. Physicians from the Dubuque area conduct specialty outreach clinics in Manchester. Physicians from the Cedar Rapids area conduct specialty outreach clinics in Manchester. Several physicians from the Dubuque area have courtesy staff privileges at the hospital, which allow them to admit up to 11 inpatients a year and to consult on an unlimited number of patients. In 1993, Delaware County Memorial Hospital

treated patients discharged in 180 different DRG categories.

132. Galena–Stauss Hospital in Galena, Illinois, has 25 licensed beds and is located within Mercy's and Finley's service area. In 1993, the hospital's daily average census was three acute-care patients. There are four physicians on the active medical staff, Galena–Stauss is at least a 15 minute drive from Dubuque but the drive time could be longer, depending on traffic, road and weather conditions. At least 6 physicians from the Dubuque area conduct specialty outreach clinics in Galena. Fourteen physicians from the Dubuque area have courtesy staff privileges at the hospital, which allows them to occasionally admit inpatients and to consult on an unlimited number of patients. In 1993, Galena–Stauss Hospital treated patients discharged in 93 different DRG categories.

133. Guttenberg Municipal Hospital in Guttenberg, Iowa, has 37 licensed beds and is located within Mercy's and Finley's service area. In 1993, the hospital's daily average census was seven acute-care patients. There are five physicians on the active medical staff, including one general surgeon. In its 1993 fiscal year, the hospital and net inpatient revenues of $1.8 million. Guttenberg Municipal Hospital is a 40 minute drive from Dubuque but the drive time could be longer, depending on traffic, road and weather conditions. At least 6 physicians from the Dubuque area conduct specialty outreach clinics in Guttenberg. The hospital has recently purchased a new surgery table and fiberoptic surgical equipment. Additionally, the hospital has budgeted for the purchase of equipment in FY 1995, including ultrasound and additional surgical equipment. Fourteen physicians from the Dubuque area have courtesy staff privileges at the hospital, which allows them to occasionally admit inpatients and to consult on an unlimited number of patients. In 1993, Guttenberg Municipal Hospital treated patients discharged in 149 different DRG categories.

134. Jackson County Public Hospital in Maquoketa, Iowa, has 99 licensed beds and is located within Mercy's and Finley's service area. It currently has the facilities to support, and is staffed, for 43 beds. In 1993, the hospital's average daily census was 12.4 acute-care patients. There are 11 physicians on the active medical staff, including one general surgeon and one internist. In its 1993 fiscal year, Jackson County Hospital's net total patient revenues were $7.6 million which constitutes more than a fourteen (14%) percent increase over 1992. Jackson County Hospital is at least a 30 minute drive from Dubuque but the drive time could be longer, depending on traffic, road and weather conditions. At least 8 physicians from the Dubuque area conduct specialty outreach clinics in Maquoketa. Several Dubuque-based physicians have courtesy staff privileges at the hospital, which allows them to occasionally admit inpatients and consult on an unlimited number of patients. Some Davenport-based physicians have courtesy staff privileges at the hospital, which allows them to occasionally admit patients and to consult on an unlimited number. In 1993, Jackson County Hospital treated patients discharged in 188 different DRG categories.

135. Lancaster Memorial Hospital in Lancaster, Wisconsin, has 35 licensed beds and is located within Mercy's and Finley's service area. In 1993, the hospital's average daily census was 20 acute-care patients. There are 9 physicians on the active medical staff. In its 1993 fiscal year, Lancaster Memorial Hospital's gross inpatient revenues were $3.7 million. Lancaster Memorial Hospital is at least a 30 minute drive from Dubuque but the drive time could be longer, depending on traffic, road and weather conditions. At least four physicians from the Dubuque area conduct specialty outreach clinics in Lancaster. Physicians from the Madison, Wisconsin area conduct specialty outreach clinics in Platteville. Several physicians from the Dubuque area have courtesy staff privileges at the hospital, which allows them to occasionally admit patients and to consult on an unlimited number of patients. In 1993, Lancaster Memorial Hospital treated patients discharged in 202 different DRG categories.

136. Southwest Health Center in Platteville, Wisconsin, has 35 licensed beds and is located within Mercy's and Finley's service

area. In 1993, the hospital's daily average census was 11 acute-care patients. There are eight physicians on the active medical staff, including two general surgeons and one internist. In its 1993 fiscal year, Southwest's net inpatient revenues were $3.5 million. Southwest Health Center is at least a 30 minute drive from Dubuque but the drive time could be longer, depending on traffic, road and weather conditions. At least ten physicians from the Dubuque area conduct specialty outreach clinics in Platteville. Physicians from the Madison, Wisconsin, area conduct specialty outreach clinics in Platteville. In 1993, Southwest Health Center treated patients discharged in 204 different DRG categories.